**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN DOE, et al.,

                Plaintiffs,

    v.

KAMALA D. HARRIS, et al.,

                Defendants.

NO. C12-5713 TEH

ORDER GRANTING
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION

This matter came before the Court on December 17, 2012, on Plaintiffs' motion for a preliminary injunction. Plaintiffs challenge several provisions of the Californians Against Sexual Exploitation Act ("CASE Act" or "Act") that require registered sex offenders to provide certain information concerning their Internet use to law enforcement. Having carefully considered the parties' written and oral arguments, the Court now GRANTS preliminary injunctive relief for the reasons explained below.

## I.    BACKGROUND

On November 6, 2012, California voters approved the CASE Act, which appeared on the ballot as Proposition 35, with approximately 81% of the vote. Ex. D to Intervenors' Req. for Judicial Notice at 1.[1] Plaintiffs John Doe, Jack Roe,[2] and the non-profit organization California Reform Sex Offender Laws filed this action on behalf of present and future

---

[1] The Court GRANTS Intervenors' unopposed request for judicial notice in its entirety.

[2] The Court granted the two individual plaintiffs' unopposed motion to proceed anonymously during the pendency of the preliminary injunction motion on November 15, 2012.

1  California sex offender registrants the following day, when the Act was to take effect.[3] *See*

2  Cal. Const. art. II, § 10(a). They contend that California Penal Code sections 290.014(b) and

3  290.015(a)(4)-(6), as enacted by the CASE Act, violate Plaintiffs' First Amendment rights to

4  free speech and free association. They further contend that the provisions are void for

5  vagueness under the Fourteenth Amendment.

6      California's sex offender registration program is governed by California Penal Code

7  section 290 *et seq.* The CASE Act added the following items to the list of information

8  registrants must provide "upon release from incarceration, placement, commitment, or

9  release on probation":

10     (4)  A list of any and all Internet identifiers established or used
11          by the person.

12     (5)  A list of any and all Internet service providers used by the
            person.

13
14     (6)  A statement in writing, signed by the person, acknowledging
            that the person is required to register and update the
            information in paragraphs (4) and (5), as required by this
15          chapter.

16 Cal. Penal Code § 290.015(a). In addition, items (4) and (5) must be reported as part of the

17 annual registration process. *Id.* § 290.012(a).

18     The Act defines "Internet service provider" as "a business, organization, or other

19 entity providing a computer and communications facility directly to consumers through

20 which a person may obtain access to the Internet," except for any "business, organization, or

21 other entity that provides only telecommunications services, cable services, or video services,

22 or any system operated or services offered by a library or educational institution." *Id.*

23 § 290.024(a). "Internet identifier" is defined as "an electronic mail address, user name,

24 screen name, or similar identifier used for the purpose of Internet forum discussions, Internet

25 chat room discussions, instant messaging, social networking, or similar Internet

26 communication." *Id.* § 290.024(b).

27     [3]California has over 75,000 registrants, excluding those who are incarcerated and
   those who have been deported. Cal. Dep't of Justice, *Cal. Sex Registrant Statistics* (Jan. 10,
28 2013), http://www.meganslaw.ca.gov/statistics.aspx?lang=ENGLISH.

2

United States District Court
For the Northern District of California

ER-0002

1    The CASE Act also added a provision that requires registrants to notify law

2    enforcement within 24 hours of any changes in the Internet information subject to

3    registration:

4    > If any person who is required to register pursuant to the Act adds
     > or changes his or her account with an Internet service provider or
5    > adds or changes an Internet identifier, the person shall send
     > written notice of the addition or change to the law enforcement
6    > agency or agencies with which he or she is currently registered
     > within 24 hours. The law enforcement agency or agencies shall
7    > make this information available to the Department of Justice.

8    *Id.* § 290.014(b). This section further requires all registrants to "immediately provide" the

9    required information to law enforcement upon the effective date of the Act. *Id.*

10    Following a telephonic hearing, the Court granted Plaintiffs' motion for a temporary

11    restraining order ("TRO") on November 7, 2012, and enjoined "Defendant Kamala Harris

12    and her officers, agents, servants, employees, and attorneys, and those persons in active

13    concert or participation with her . . . from implementing or enforcing California Penal Code

14    sections 290.014(b) and 290.015(a)(4)-(6), as enacted by Proposition 35, or from otherwise

15    requiring registrants to provide identifying information about their online speech to the

16    government." Nov. 7, 2012 Order at 3. Pursuant to the parties' agreement, the Court

17    explicitly applied this order "to all California state and local law enforcement officers and to

18    all members of the putative class, i.e., to all persons who are required to register under

19    California Penal Code section 290, including those whose duty to register arises after the date

20    of this order." *Id.*

21    On November 14, 2012, the Court entered a stipulation and order deleting the

22    application of the TRO to "all California state and local law enforcement officers," but

23    providing that "the California Department of Justice and local law enforcement will not

24    require registrants to submit the information covered by the TRO so long as the TRO remains

25    in effect." Nov. 14, 2012 Stip. & Order ¶ 3. The parties further agreed that the TRO would

26    remain in effect "until the Court issues its ruling on Plaintiffs' Motion for a Preliminary

27    Injunction or January 11, 2013, whichever occurs first," *id.* ¶ 4, and that "any preliminary

28    injunctive relief granted by the Court will apply both to the named Plaintiffs and to all

3

*United States District Court*
For the Northern District of California

1  persons who are required to register under California Penal Code § 290, including those

2  whose duty to register arises during the pendency of the TRO and any preliminary injunctive

3  relief," *id.* ¶ 2.  In addition, the parties agreed that this matter would be litigated as a facial

4  challenge unless and until Plaintiffs provide the Attorney General with at least 45 days notice

5  that they intend to raise an as-applied challenge. *Id.* ¶ 6.

6      Chris Kelly and Daphne Phung, the proponents of Proposition 35, moved to intervene

7  on November 12, 2012.  Although the Court did not grant the motion to intervene until

8  January 10, 2013, Intervenors filed a written opposition and addressed the Court at oral

9  argument.  Thus, they were fully heard on Plaintiffs' motion for a preliminary injunction.

10

11  **II.    LEGAL STANDARD**

12      To obtain a preliminary injunction, Plaintiffs must establish that: (1) they are likely to

13  succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of the

14  preliminary injunction; (3) the balance of equities tips in their favor; and (4) the issuance of

15  the preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*,

16  555 U.S. 7, 20 (2008).  A stronger showing on one of these four elements may offset a

17  weaker showing on another, but the movant must nonetheless "make a showing on all four

18  prongs." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

19

20  **III.    DISCUSSION**

21      **A.    Likelihood of Success on the Merits**

22      The Court first considers Plaintiffs' likelihood of success on the merits.  Because the

23  Court finds Plaintiffs likely to succeed on their First Amendment speech claim for the

24  reasons discussed below, it does not address whether Plaintiffs are likely to succeed on any

25  of their remaining claims.

26          **1.    First Amendment Legal Principles**

27      This case concerns the First Amendment's protection of the right to speak

28  anonymously online. *See In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir.

*(left margin, vertical text)* **United States District Court** For the Northern District of California

4

**United States District Court**
For the Northern District of California

1  2011). It is undisputed that speech by sex offenders who have completed their terms of

2  probation or parole enjoys the full protection of the First Amendment. Rep. Tr. at 21:11-15

3  (Plaintiffs), 51:4-10 (government), 51:23-24 (Intervenors); *see also Simon & Schuster, Inc.*

4  *v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991) (striking down New York

5  law that sought to interfere with criminals' profiting from works describing their crimes).

6  The provisions at issue here are not outright bans on anonymous online speech, but they may

7  still violate the First Amendment if they impermissibly burden such speech: "[T]he

8  distinction between laws burdening and laws banning speech is but a matter of degree . . . .

9  Lawmakers may no more silence unwanted speech by burdening its utterance than by

10 censoring its content." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011) (internal

11 quotation marks and citation omitted).[4]

12      Plaintiffs here challenge the CASE Act as facially overbroad. Although Plaintiffs

13 bear the burden of demonstrating a likelihood of success on the merits under the preliminary

14 injunction standard, the government ultimately "bears the burden of proving the

15 constitutionality of its actions" whenever it seeks to restrict speech. *United States v. Playboy*

16 *Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000).

17      To succeed on a facial overbreadth challenge under the First Amendment, a plaintiff

18 must demonstrate either "that no set of circumstances exists under which [the statute] would

19 be valid," or that "a substantial number of [the statute's] applications are unconstitutional,

20 judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 130 S.

21 Ct. 1577, 1587 (2010) (internal quotation marks and citations omitted). The Court's inquiry

22 is not limited to the application of the challenged provisions to the particular plaintiffs before

23 it, as "[l]itigants . . . are permitted to challenge a statute not because their own rights of free

24 expression are violated, but because of a judicial prediction or assumption that the statute's

25 very existence may cause others not before the court to refrain from constitutionally

26      [4]That the challenged provisions were enacted by voter initiative does not alter the
27 constitutional analysis. "The voters may no more violate the United States Constitution by
   enacting a ballot issue than the general assembly may by enacting legislation." *Buckley v.*
28 *Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 194 (1999) (internal quotation marks and
   citation omitted).

5

protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).
However, "the mere fact that one can conceive of some impermissible applications of a
statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the
City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

　　　　Plaintiffs urge the Court to subject the challenged provisions to strict scrutiny because
they discriminate against registrants as a class of speakers.  However, strict scrutiny is only
required where "speaker-based laws . . . reflect the government's preference for the
substance of what the favored speakers have to say (or aversion to what the disfavored
speakers have to say)." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994).  Here,
the Act reflects no such preference and operates without regard to the message that any
registrant's speech conveys.  The challenged provisions are therefore content-neutral, and
intermediate scrutiny applies.  *Id.* at 662; *see also Doe v. Shurtleff*, 628 F.3d 1217, 1223
(10th Cir. 2010) (applying intermediate scrutiny to Utah reporting requirement that said
"nothing about the ideas or opinions that [registrants] may or may not express, anonymously
or otherwise" and were not "aimed at suppressing the expression of unpopular views"
(internal quotation marks, alteration, and citation omitted)).

　　　　Under intermediate scrutiny, a law must "'be narrowly tailored to serve the
government's legitimate, content-neutral interests.'" *Comite de Jornaleros de Redondo
Beach v. City of Redondo Beach*, 657 F.3d 936, 947 (9th Cir. 2011) (en banc), *cert. denied*,
132 S. Ct. 1566 (2012) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)).
"To satisfy this standard, the law need not be the least speech-restrictive means of advancing
the Government's interests"; the test is whether "the means chosen . . . burden substantially
more speech than is necessary to further the government's legitimate interests." *Turner*, 512
U.S. at 662 (internal quotation marks and citation omitted).  The "essence of narrow
tailoring" is to "focus[] on the source of the evils the [government] seeks to eliminate . . . and
eliminate[] them without at the same time banning or significantly restricting a substantial
quantity of speech that does not create the same evils." *Ward*, 491 U.S. at 799 n.7.

United States District Court
For the Northern District of California

6

ER-0006

### 2.    Construing the Statute

Before determining whether a challenged provision violates the First Amendment, a court must first construe the provision; "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). In doing so, the Court must consider the government's "own implementation and interpretation," but it is "not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance." *Comite*, 657 F.3d at 946 (internal quotation marks and citations omitted). Instead, the court may impose a limiting construction only if a provision is, on its face, "readily susceptible" to such a construction. *Reno v. ACLU*, 521 U.S. 844, 884 (1997) (internal quotation marks and citation omitted). Applying these principles to this case, the Court finds that the reporting requirements for "Internet service providers" and "Internet identifiers" are readily susceptible to the narrowing constructions discussed at oral argument and advanced by the government.[5]

### a.    "Internet service provider"

The CASE Act defines "Internet service provider" as a "business, organization, or other entity providing a computer and communications facility directly to consumers through which a person may obtain access to the Internet," excluding any "business, organization, or other entity that provides only telecommunications services, cable services, or video services, or any system operated or services offered by a library or educational institution." Cal. Penal Code § 290.024(a). Pursuant to § 290.015(a)(5), a person subject to the reporting

---

[5]The government and Intervenors also suggest that, in construing the reporting requirements, the Court may look to the federal standards for state sex offender registry and notification systems developed under the Sex Offender Registration and Notification Act ("SORNA"). *See* 42 U.S.C. § 16915a(a) (providing for collection of "those Internet identifiers the sex offender uses or will use of any type that the Attorney General determines to be appropriate"); Nat'l Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38,030-01 at 38,055 (July 2, 2008) (U.S. Attorney General guidelines for state registries to include "all designations used by sex offenders for purposes of routing or self-identification in Internet communications or postings"). The Court does not find it necessary to rely on SORNA for this purpose because, as discussed below, it finds the construction of the statutes proposed by the government and Intervenors to be supported by the statutes' plain language. Neither the government nor Intervenors argue that SORNA affects the Court's analysis on any other issue.

7

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  requirements must, upon registration, provide to law enforcement "[a] list of any and all

2  Internet service providers used by the person." At oral argument, the government stated that

3  the plain language of the Act limits this requirement to only "Internet service providers with

4  which the registrant has an open account at the time of the registration." Rep. Tr. at 48:2-15;

5  *cf. id.* at 49:2-5 (noting Intervenors' agreement). Plaintiffs acknowledged that it would be

6  permissible for the Court to construe the statute in this manner, *id.* at 17:15-18:1, and the

7  Court now does so. Reading section 290.015(a)(5) to exclude providers that are only

8  accessed or used by the registrant, as opposed to those with which the registrant has an

9  account, is consistent with both the common understanding of "Internet service provider" and

10  California Penal Code section 290.014(b), which requires a registrant to update law

11  enforcement only when he or she "adds or changes his or her *account* with an Internet

12  service provider" (emphasis added).

13               **b.**    **"Internet identifier"**

14        The CASE Act's definition of "Internet identifier" – "an electronic mail address, user

15  name, screen name, or similar identifier used for the purpose of Internet forum discussions,

16  Internet chat room discussions, instant messaging, social networking, or similar Internet

17  communication" – is also readily susceptible to a construction that avoids many of the

18  potential problems suggested by Plaintiffs. *Id.* § 290.024(b).[6] The Act may be reasonably

19  interpreted to require reporting only of Internet identifiers actually used to post a comment,

20  send an email, enter into an Internet chat, or engage in another type of interactive

21  communication on a website, and not identifiers a registrant uses solely to purchase products

22  or read content online. *See* Rep. Tr. at 63:8-16 (Intervenors suggesting this rule); *id.* at

23  64:22-24 (government focusing on "interactive communications" as the test for whether an

24  Internet identifier must be reported); *id.* at 37:5-8 (Plaintiffs saying that it would be

25

26  ──────────────────────

27      [6]Plaintiffs expressed fear that law enforcement may subsequently decide to require registrants to report the websites associated with their Internet identifiers. However, as Plaintiffs acknowledge, the Act's language requires the reporting only of Internet identifiers

28  and not associated websites. Mot. at 22-23.

United States District Court

For the Northern District of California

1    reasonable to interpret the Act to "count[] once you actually use that account to post

2    something").[7]

3       This interpretation raises the question of when a registrant must report an Internet

4    identifier that could potentially be used for interactive communication but that the registrant

5    initially uses only to view content or make a purchase online. At oral argument, the

6    government assured the Court that it would not require a registrant to report such an

7    identifier upon creating it, but that a registrant would have to report the identifier within 24

8    hours of first using the identifier to engage in interactive communication. Rep. Tr. at 65:21-

9    66:11. The Court finds this construction to be reasonable.

10       Consistent with the above discussion, the Court construes the challenged provisions

11    as requiring registrants to report: (1) "Internet service providers" with which the registrant

12    has a current account at the time of registration or with which the registrant later creates an

13    account, and (2) "Internet identifiers" that are actually used by the registrant to engage in

14    interactive communication with others, within 24 hours of the registrant's first use of the

15    identifier for interactive communication.

16           **3.**    **Narrow Tailoring**

17       The Court now turns to whether Plaintiffs are likely to succeed in showing that the

18    challenged provisions, as just construed, fail to satisfy the First Amendment under

19    intermediate scrutiny. This requires the Court to determine whether the provisions are

20    "narrowly tailored to serve the government's legitimate, content-neutral interests." *Comite*,

21    657 F.3d at 947 (internal quotation marks and citation omitted).

22       The CASE Act's stated purposes include "combat[ing] the crime of human

23    trafficking" and "strengthen[ing] laws regarding sexual exploitation, including sex offender

24    registration requirements, to allow law enforcement to track and prevent online sex offenses

---

25

26    [7]The government suggested that blog usernames need not be reported as long as the blog did not permit interactive comments. Rep. Tr. at 63:17-19. The Court declines to

27    interpret the statute in this fashion since the government has not explained why a registrant's use of his or her own non-interactive blog to comment should be distinguished from his or

28    her posting the same comment on a different website. However, this deviation from the government's proposed construction is not material to the Court's First Amendment analysis.

1   and human trafficking." CASE Act § 3(1), (3). The Act's text also expresses an interest in

2   "deter[ring] predators from using the Internet to facilitate human trafficking and sexual

3   exploitation." *Id.* § 2(6). Plaintiffs do not dispute that these are legitimate government

4   interests. *Cf., e.g., Doe v. Jindal*, 853 F. Supp. 2d 596, 805 (M.D. La. 2012) ("There can be

5   no doubt that the state has a wholly legitimate interest in protecting children from sex

6   offenders online.").

7       It is not difficult to imagine situations in which having registrants' Internet identifiers

8   would advance these interests. For instance, if a registered sex offender used a social

9   networking site to recruit victims for human trafficking, being able to match the Internet

10  identifier used to do the recruiting against a database of registered Internet identifiers could

11  help to identify the perpetrator.[8] *Cf.* Bock Decl. ¶ 10 (describing trafficking case of twin

12  girls recruited through a social networking site). Likewise, a database of Internet identifiers

13  could be used to identify the perpetrator of a sex offense – assuming that the person were a

14  registrant[9] – who used an anonymous Internet account to make contact with his or her

15  victim. *Cf. id.* ¶ 11 (describing case of a person who raped four women he contacted via

16  Craigslist, including a teenage victim "whose pimp had been trafficking her"). Although the

17  government has not presented any real-life examples involving the use of Internet

18  information in a sex offender registry to prevent or solve a crime,[10] the Court finds that the

19  challenged provisions could conceivably advance the legitimate purposes of the Act. It now

20  turns to the question of whether they are narrowly tailored to achieving those purposes.

21

22

23      [8]This assumes that the re-offending registrant complied with the Internet reporting
        requirements enacted by the CASE Act.

24      [9]Plaintiffs' unchallenged statistics suggest that "most online predators" –
25      approximately 96% – "are not registered offenders and have no prior record." Finkelhor
        Decl. ¶ 18.

26      [10]The government argues that it cannot provide such examples from California
        because the challenged provisions have not yet gone into effect. However, neither the
27      government nor Intervenors responded to Plaintiffs' observation that data from other
        jurisdictions where Internet registration requirements are in effect could shed light on the
28      potential impact of such requirements in California.

United States District Court
For the Northern District of California

1    Defendants and Intervenors assert that *Shurtleff*, 628 F.3d 1217, in which the Tenth

2   Circuit upheld a reporting requirement in Utah, is persuasive authority that the CASE Act

3   should survive scrutiny under the First Amendment.  In *Shurtleff*, the challenged statute

4   required a registrant "to provide all 'Internet identifiers and the addresses [he] uses for

5   routing or self-identification in Internet communications or postings.'"  *Id.* at 1221 (footnote

6   omitted) (alteration in original) (quoting Utah Code Ann. § 77-27-21.5(14)(i) (West 2008)).

7   An Internet identifier was defined as "'any electronic mail, chat, instant messenger, social

8   networking, or similar name used for Internet communication.'"  *Id.* at 1221 n.1 (quoting

9   Utah Code Ann. § 77–27–21.5(1)(j)).  The district court found that the original statutory

10   scheme violated the First Amendment because it "contained no restrictions on how the

11   [state] could use or disseminate registrants' Internet information, implicating protected

12   speech and criminal activity alike."  *Doe v. Shurtleff*, Case No. 1:08-CV-64-TC, 2009 WL

13   2601458, at *1 (D. Utah Aug. 20, 2009).

14    The Utah legislature subsequently amended the statute to limit state officials' use of

15   the information to "investigating kidnapping and sex-related crimes, and . . apprehending

16   offenders. . . ."  *Shurtleff*, 628 F.3d at 1221 (internal quotation marks omitted) (quoting Utah

17   Code Ann. § 77-27-21.5(2) (West Supp. 2010)).  The legislature simultaneously amended

18   the state's public records act "to designate certain information provided by an offender,

19   including internet identifiers, as private."[11]  *Id.* (citing Utah Code Ann. § 63G-2-302(1)(m)).

20   This meant that the information could "only be disclosed in limited circumstances such as

21   when requested by the subject of the record, or pursuant to a court order or legislative

22   subpoena," and could be shared "between different government entities and their agents"

23   only if the entity receiving the record placed "the same restrictions on disclosure of the

24   record as the originating entity."  *Id.* at 1221 n.4 (internal quotation marks omitted) (citing

25   Utah Code Ann. §§ 63G-2-201(5), 63G-2-202, and quoting Utah Code Ann. § 63G-2-206).

26   The Tenth Circuit "read this language, as did the district court, as only allowing state actors

27

28    [11]The legislature also amended the statute to remove "any requirement that offenders
disclose their passwords."  *Shurtleff*, 628 F.3d at 1221.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    to look beyond the anonymity surrounding a username in the course of an investigation after

2    a new crime has been committed," and further interpreted the statute "as permitting sharing

3    only among law-enforcement agencies, not the public at large." *Id.* at 1225. The court

4    consequently found no First Amendment problem: "Although this narrow interpretation

5    may still result in the disclosure of Mr. Doe's online identifiers to state officials," the court

6    reasoned, "such identification will not unnecessarily interfere with his First Amendment

7    freedom to speak anonymously." *Id.*

8         In California, sex offender registration statements are not subject to "inspection by the

9    public or by any person other than a regularly employed peace officer or other law

10   enforcement officer," Cal. Penal Code § 290.021, but a law enforcement entity may disclose

11   registrants' information to the public "by whatever means the entity deems appropriate,

12   when necessary to ensure the public safety based upon information available to the entity

13   concerning that specific person," *id.* § 290.45(a)(1). With any such disclosure, the entity

14   must include "a statement that the purpose of the release of information is to allow members

15   of the public to protect themselves and their children from sex offenders." *Id.*

16   § 290.45(a)(2). These California statutes do not contain the safeguards present in the

17   amended Utah statutes and are closer to the pre-amendment Utah statutes initially found

18   unconstitutional by the district court in *Doe v. Shurtleff*, Case No. 1:08-CV-64-TC, 2008 WL

19   4427594 (D. Utah Sept. 25, 2008).

20        They are also similar to a Georgia statute – struck down by the district court in *White*

21   *v. Baker*, 696 F. Supp. 2d 1289 (N.D. Ga. 2010) – that permitted disclosure of registrants'

22   Internet information "to law enforcement agencies for law enforcement purposes" and to the

23   public as "necessary to protect the public" without any other limitations. *Id.* at 1309

24   (quoting O.C.G.A. § 41-1-12(o)). This Court agrees with the *White* court, which found the

25   lack of statutory protections on disclosure to be troubling:

26        It is conceivable, if not predictable, that a person in law
        enforcement might determine that Internet Identifiers for

27        offenders ought to be released so that the public can search for
        and monitor communications which an offender intends to be

28

12

> anonymous. That these anonymous communications might well
> be on a matter of public policy, political speech, or other
> protected speech squarely implicates the First Amendment. . . .
> The prospect that Internet Identifiers, as currently defined, may
> be released to the community has an obvious chilling effect.

*Id.* at 1310-11.[12]

While the government asserted at oral argument that there has to be "some kind of nexus" between the use of an Internet identifier and criminal activity before law enforcement can access information related to a registrant's Internet identifier, Rep. Tr. at 54:23-55:15, the Court "cannot simply presume the [government] will act in good faith and adhere to standards absent from the [statute's] face." *Comite*, 657 F.3d at 946-47 (internal quotation marks, alteration, and citation omitted). Here, Plaintiffs have no guarantee that their pseudonyms will be safeguarded from public dissemination because neither the CASE Act nor any other California statute requires the nexus asserted by the government at the hearing. Their right to speak anonymously will therefore be chilled.

This chilling effect is heightened because, unlike in the Utah or Georgia cases, the disclosure of a registrant's identity – at least to law enforcement, and potentially to the public as well – will occur either before he or she speaks or, at maximum, within 24 hours after speaking and potentially while the speech is ongoing. *Cf. Shurtleff*, 628 F.3d at 1225 (finding that disclosure "would generally occur, if at all, at some time period following Mr. Doe's speech and not at the moment he wished to be heard"); *White*, 696 F. Supp. 2d at 1294 (noting that the Georgia statute required registrants to provide updated information within 72 hours). A contemporaneous disclosure requirement poses a greater burden on speech than an after-the-fact disclosure requirement because it "connects the speaker to a particular message directly." *ACLU v. Heller*, 378 F.3d 979, 991-92 (9th Cir. 2004). When a California registrant wants to speak online, he or she must use either a previously reported Internet identifier – in which case the disclosure to law enforcement would have occurred

---

[12]The Georgia statute defined "Internet Identifier" as "E-mail addresses, usernames, and user passwords," and further defined "username" as "a string of characters chosen to uniquely identify an individual who uses a computer or other device with Internet capability to gain access to e-mail messages and interactive online forums." *White*, 696 F. Supp. 2d at 1295 (quoting O.C.G.A. § 42-1-12(a)(16)(K) & (a)(21.1)).

13

United States District Court

For the Northern District of California

1   prior to the speech – or a new identifier that must be reported within 24 hours, regardless of

2   whether any conversation using the identifier has concluded.  Because it results in a risk of

3   more contemporaneous disclosure, this reporting requirement is even more problematic than

4   the 72-hour reporting requirement found to be unconstitutional in *White*.  It likewise creates

5   a far greater chilling effect on anonymous speech than the statute upheld in *Shurtleff*,

6   especially when combined with the lack of statutory protections on the information's

7   disclosure to other law enforcement agencies and the public.

8       Registrants' speech may also be chilled because failure to comply with sex offender

9   registration requirements, including the Internet provisions, is punishable by up to three

10  years in state prison.  Cal. Penal Code § 290.018(a)-(c).  This potential punishment may

11  deter registrants from speaking at all if they are uncertain about whether they have to report a

12  particular Internet identifier to law enforcement and, if so, whether they will be able to file

13  any such report within the required 24-hour period.  *See NAACP v. Button*, 371 U.S. 415,

14  433 (1963) ("The threat of sanctions may deter the[] exercise [of First Amendment rights]

15  almost as potently as the actual application of sanctions.").  The uncertainty surrounding

16  what registrants must report – and the resultant potential chilling effect – is greater in this

17  case because the Court's interpretation of the Act is not definitive guidance to registrants

18  about what they must report.  While the Court construed the Act's provisions for purposes of

19  determining whether they violate the First Amendment, this Court's interpretation is not

20  binding on state courts, where the registrants would face prosecution for failure to register.

21  *See Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1146 (9th Cir. 2001) ("[I]t is

22  solely within the province of the state courts to authoritatively construe state legislation.").

23      The CASE Act provisions' chilling effect  might be justifiable if the provisions were

24  narrowly tailored, but – at least at this stage of the proceedings – the government has not

25  persuaded the Court that they are.  For the reasons discussed below, the Court finds that the

26  provisions apply both to more speakers and more speech than is necessary to advance the

27  government's legitimate purposes.

28

United States District Court
For the Northern District of California

14

1    First, the Court is not persuaded that burdening the anonymous speech rights of all

2  75,000 registered sex offenders is narrowly tailored to the government's interest in fighting

3  online sex offenses.  The government already classifies registrants using a risk-assessment

4  tool known as Static-99.  Using this instrument, the State has classified the majority of

5  registrants released on parole after 2005 as posing a "low" or "moderate-low" risk of

6  re-offending.  Abbott Decl. ¶ 9.  The government has not sufficiently explained why these

7  individuals ought to be treated differently from non-registrants who are not required to report

8  Internet-identifying information to authorities.  This fact is not altered by Intervenors'

9  reliance on Plaintiffs' data that "[p]edophiles who molest boys and rapists of adult women

10  have recidivism rates of 52% and 39% respectively," or that the overall average recidivism

11  rate for registrants in all risk categories is between 14% and 20%.  *Id.* ¶ 15.  The issue is not

12  whether registrants recidivate, which Plaintiffs do not dispute.  Instead, the problem is that

13  the government has not explained why the collection of Internet-identifying information

14  from registrants who present a low or moderately low risk of re-offending, and a potentially

15  even lower risk of re-offending online,[13] is narrowly tailored to the Act's purposes.  Based

16  on the State's own existing risk assessments, the uniform application of the CASE Act

17  appears overbroad.[14]

18    At oral argument, the government asserted that Static-99 cannot be used to limit the

19  number of registrants who must report Internet-identifying information because the CASE

20  Act's "Internet identifier registration requirements serve[] a different purpose" than

21  Static-99's purpose of "estimat[ing] the risk that a person might pose when they are released

---

23  [13]No party or intervenor presented any evidence concerning the rate by which
   registered sex offenders re-offend using the Internet.  The only statistical evidence presented
24  on the prevalence of Internet use in the commission of sex offenses was from a national study
   of 2006 arrests, which indicated that only approximately 1% of sex offenses against children
25  involved the Internet or other technology.  Finkelhor Decl. ¶ 12.

26  [14]Even if the Act were applied only to the registrants deemed to pose a higher risk by
   the State's Static-99 tool, this, too, could still be insufficiently tailored because it considers
27  only the risk of re-offending, not the risk of committing a sex offense online – which is the
   CASE Act's stated focus.  However, the challenged provisions currently apply to all
28  registrants, regardless of risk, and the Court therefore need not and does not decide this
   question.

1    to the community." Rep. Tr. at 76:19-77:1.  The purpose of the CASE Act's new

2    registration requirements is, according to the government, "to be able to find somebody if we

3    need to."  *Id.* at 77:1-2.  However, the government has not explained how being able to find

4    all registered sex offenders using Internet identifiers – regardless of the registrants' risk of

5    re-offending as determined by the government's own assessment tool – is narrowly tailored

6    to achieving the Act's legitimate interest in combating online sex offenses or human

7    trafficking.

8            In addition, even as to registrants who may legitimately be required to register

9    Internet-identifying provisions based on their risk of recidivism, the challenged provisions

10   appear to extend to too much speech.  When asked at oral argument what kinds of

11   communications it would be "most helpful for law enforcement to be able to monitor," the

12   government referred to *White v. Baker*, stating that the court there said that "Internet chatting

13   and social networks and chat rooms . . . were the most helpful, that mostly involved the

14   exploitation of children."  Rep. Tr. at 75:1-8.  Indeed, the *White* court found that online

15   solicitation for sexual exploitation "generally do[es] not occur in communications that are

16   posted publicly on sites dedicated to discussion of public, political, and social issues."  696

17   F. Supp. 2d at 1310.  The government has not shown the utility of requiring registration of

18   Internet identifiers used for this type of public commentary.

19           Nonetheless, the CASE Act provisions extend to all such websites, and registrants are

20   likely to be chilled from engaging in legitimate public, political, and civic communications

21   for fear of losing their anonymity.  As a Nebraska district court forcefully stated, a

22   requirement that sex offenders report to the government all communications on blogs and

23   websites "puts a stake through the heart of the First Amendment's protection of anonymity

24   [and] surely deters faint-hearted offenders from expressing themselves on matters of public

25   concern."  *Doe v. Nebraska*, Case No. 8:09CV456, 2012 WL 4923131, at *28 (D. Neb.

26   Oct. 17, 2012); *see also White*, 696 F. Supp. 2d at 1310 (concluding that a requirement was

27   overbroad because it included communications that did not "reasonably present a vehicle by

28   which a sex offender can entice a child to have illicit sex").  This Court agrees.  Applying the

United States District Court

For the Northern District of California

16

1    registration requirements to all Internet forums, even those types that have not been shown to

2    pose any reasonable risk of leading to an online sex offense or human trafficking, creates a

3    significant chilling effect on Plaintiffs' protected speech.[15]

4         In short, at this preliminary stage of the proceedings, the government, with the

5    Intervenors' support, has failed to show that the CASE Act's reporting requirements are

6    narrowly tailored to serve its legitimate interests.  The challenged provisions have some

7    nexus with the government's legitimate purpose of combating online sex offenses and

8    human trafficking, but "[t]he Government may not regulate expression in such a manner that

9    a substantial portion of the burden on speech does not serve to advance its goals."  *Ward*,

10   491 U.S. at 799.  On the current record, the Court concludes that Plaintiffs are likely to

11   establish that the challenged provisions, when combined with the lack of protections on the

12   information's disclosure and the serious penalty registrants face if they fail to comply with

13   the reporting requirements, create too great a chilling effect to pass constitutional muster.

14   While the government may be able to demonstrate narrow tailoring in subsequent

15   proceedings, it has not done so here.  Accordingly, the Court concludes that Plaintiffs are

16   likely to succeed on their First Amendment free speech claim.

17

18   **B.    Remaining Preliminary Injunction Factors**

19        To warrant injunctive relief, Plaintiffs must also show that they are likely to suffer

20   irreparable harm in the absence of an injunction and demonstrate that the public interest and

21   balance of equities weigh in their favor.  As discussed below, the Court finds that Plaintiffs

22   have sufficiently established all of these factors.

23        First, neither the government nor Intervenors dispute that Plaintiffs are likely to suffer

24   irreparable harm in the absence of an injunction.  Indeed, the Supreme Court long ago

25

26        [15]The Court recognizes that, like the challenged provisions here, the Utah statutes
     upheld by the Tenth Circuit in *Shurtleff* applied broadly to all Internet forums and all
27   registered sex offenders.  However, as discussed above, the chilling effect of the Utah statute
     was diminished, if not eliminated, by the statutory restrictions on disclosure and the lack of a
28   relatively contemporaneous reporting requirement.

                                                17

United States District Court
For the Northern District of California

1    explained that "[t]he loss of First Amendment freedoms, for even minimal periods of time,

2    unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

3              Second, the Ninth Circuit has "consistently recognized the 'significant public

4    interest' in upholding free speech principles," *Klein v. City of San Clemente*, 584 F.3d 1196,

5    1208 (9th Cir. 2009), and has further observed that "it is always in the public interest to

6    prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990,

7    1002 (9th Cir. 2012) (internal quotation marks and citation omitted).

8              Third, based on the present record, the government has not demonstrated that the

9    CASE Act's impact on public safety is sufficient to overcome the interest – both to Plaintiffs

10   and to the public – in avoiding infringement of Plaintiffs' First Amendment rights.  As the

11   Supreme Court has explained, "[t]he prospect of crime . . . by itself does not justify laws

12   suppressing protected speech," nor may the government "prohibit speech because it increases

13   the chance an unlawful act will be committed at some indefinite future time." *Ashcroft v.*

14   *Free Speech Coal.*, 535 U.S. 234, 245, 253 (2002) (internal quotation marks and citation

15   omitted).  In this case, the government has not provided any evidence regarding the extent to

16   which the public safety might be enhanced if the additional registration requirements went

17   into effect.  Plaintiffs' evidence – as yet undisputed – indicates that only 1% of arrests for sex

18   crimes against children are for crimes facilitated by technology, Finkelhor Decl. ¶ 12, and

19   that registered sex offenders are involved in only 4% of these arrests, *id.* ¶ 18.  While the

20   Court does not minimize the significance of any single crime, the record at this stage of the

21   proceedings suggests that the potential usefulness of the Internet registration information is

22   limited to a very small portion of the universe of sex offenses and online sex offenses.

23   Moreover, enjoining the Internet registration requirements enacted by the CASE Act would

24   not prevent the government from investigating online sex offenses, as it could still employ

25   other mechanisms to do so. *See, e.g., Doe v. Shurtleff*, 2008 WL 4427594, at *9 (noting that,

26   even in the absence of an Internet registration requirement, "investigators of internet crime

27   already have tools to unmask anonymous internet suspects, such as investigative

28   subpoenas").  Against the government's weak showing of the utility of registrants' Internet

*United States District Court*
For the Northern District of California

1  information if the Act is not enjoined, the Court must weigh the likely and substantial

2  chilling of Plaintiffs' First Amendment rights discussed above.  Having done so, the Court

3  concludes that both the balance of equities and the public interest weigh in favor of granting

4  injunctive relief.

5

6  ## C.    Application of Injunction to Local Law Enforcement

7      Finally, the Court must address whether any injunctive relief binds local law

8  enforcement officials in California or only the Attorney General.  The parties agreed that

9  local law enforcement officials would not enforce the challenged provisions during the

10  pendency of the temporary restraining order, but the government now argues that an

11  injunction against the Attorney General cannot bind local law enforcement agencies or

12  personnel.  For support, the government cites a single California appellate case from seventy

13  years ago for the proposition that "the California Constitution does not contemplate absolute

14  control and direction of sheriffs" by the Attorney General.  Gov't Opp'n at 9 (citing *People

15  v. Brophy*, 49 Cal. App. 2d 15, 28 (1942)).

16      The government's argument is beside the point.  Federal Rule of Civil Procedure

17  65(d)(2) provides that an injunction will bind the parties, as well as "the parties' officers,

18  agents, servants, employees, and attorneys," and "[o]ther persons who are in active concert or

19  participation with" these individuals.  Even if the Attorney General does not have absolute

20  control and direction over local law enforcement, it cannot be disputed that, as to the

21  collection of sex offender registration data, local law enforcement at least acts "in active

22  concert or participation with" the Attorney General, if not as her agent.  *See, e.g.,* Cal. Penal

23  Code § 290.015(b) (requiring local law enforcement agencies to forward registrants'

24  information to the Department of Justice[16] within three days of registration); Schweig Decl.

25  ¶ 3 (describing the collection of sex offender registration data as a "collaborative effort"

26

27  _____

28  [16]"The Attorney General is head of the Department of Justice."  Cal. Gov't Code
§ 12510.

United States District Court
For the Northern District of California

19

1     involving, among others, the California Department of Justice and local law enforcement

2     agencies).

3          However, Federal Rule of Civil Procedure 65(d)(2) also provides that an injunction

4     only binds persons "who receive actual notice of it by personal service or otherwise."  To

5     ensure that all local law enforcement officials who are responsible for collecting registered

6     sex offenders' information are bound by this order, the Court will order the Attorney General

7     to provide actual notice to all such officials.  This requirement does not preclude the parties

8     from further meeting and conferring to attempt to reach agreement that local law

9     enforcement will not enforce the enjoined provisions as long as the Court's order granting

10     preliminary injunctive relief remains in effect.

11

**IV.    CONCLUSION**

13          The Court does not lightly take the step of enjoining a state statute, even on a

14     preliminary basis.  However, just as the Court is mindful that a strong majority of California

15     voters approved Proposition 35 and that the government has a legitimate interest in

16     protecting individuals from online sex offenses and human trafficking, it is equally mindful

17     that "[a]nonymity is a shield from the tyranny of the majority," and that Plaintiffs enjoy no

18     lesser right to anonymous speech simply because they are "unpopular."  *McIntyre v. Ohio*

19     *Elections Comm'n*, 514 U.S. 334, 357 (1995).  The record before the Court does not establish

20     that the Internet registration requirements enacted by the CASE Act are narrowly tailored to

21     the Act's legitimate purpose of combating online sex offenses and human trafficking.  While

22     the government may be able to make the necessary showing at a later stage of these

23     proceedings, it has not yet done so, and the Court therefore concludes that Plaintiffs have

24     demonstrated a likelihood of success on the merits of their First Amendment free speech

25     claim.

26     //

27     //

28     //

**United States District Court**
For the Northern District of California

1    Accordingly, with good cause appearing for the reasons stated in this order, Plaintiffs'

2  motion for a preliminary injunction is GRANTED.  IT IS HEREBY ORDERED that:

3    1.  Defendant Kamala Harris and her officers, agents, servants, employees, and

4  attorneys, and those persons in active concert or participation with her, are enjoined from

5  implementing or enforcing California Penal Code sections 290.014(b) and 290.015(a)(4)-(6),

6  as enacted by the CASE Act.[17]

7    2.  Defendant Harris shall provide, by personal service or otherwise, actual notice of

8  this order to all law enforcement personnel who are responsible for implementing or

9  enforcing the enjoined statutes or from otherwise collecting registered sex offenders'

10  information.  The government shall file a declaration establishing proof of such notice on or

11  before **January 28, 2013**.  Alternatively, the parties may file on or before that date a

12  stipulation and proposed order that local law enforcement will not enforce the enjoined

13  provisions even in the absence of receiving actual notice.

14

15  **IT IS SO ORDERED.**

16

17  Dated:  01/11/13

      THELTON E. HENDERSON, JUDGE
18      UNITED STATES DISTRICT COURT

19

20

21

22

23

24

25

26  [17]A careful reader may observe that the Court has omitted the phrase, "or from
      otherwise requiring registrants to provide identifying information about their online speech to
      the government," from the temporary restraining order.  Nov. 7, 2012 Order at 3.  This
27  should not be interpreted as the Court's permission to attempt an end run around the
      preliminary injunction entered today.  The Court removed this language out of an abundance
28  of caution that the scope of its injunction not reach too broadly.

United States District Court
For the Northern District of California

21

Pages 1 - 85

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THELTON E. HENDERSON, JUDGE


| | |
|---|---|
| JOHN DOE, et al.,       ) | |
|                      ) | |
|           Plaintiffs  ) | |
|                      ) | |
|                   v    ) | NO. CV 12-5713 TEH |
|                      ) | |
| KAMALA D. HARRIS, et al.,  ) | |
|                      ) | |
|           Defendants.  ) | |

San Francisco, California
Monday, December 17, 2012

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs            ACLU Foundation
                          of Northern California, Inc.
                          39 Drumm Street
                          San Francisco, CA 94111
           **BY:  MICHAEL T. RISHER, Attorney at Law**
                **LINDA LYE, Attorney at Law**

For Plaintiffs            Electronic Frontier Foundation
                          454 Shotwell Street
                          San Francisco, CA 94110
           **BY:  HANNI FAKHOURY, Attorney at Law**
                **LEE TIEN, Attorney at Law**

(Appearances continued on next page.)


Reported By:              CHRISTINE TRISKA, CSR, RPR
                          Pro-Tem Reporter

**APPEARANCES CONTINUED:**


For Defendant            California State Attorney General's
Kamala Harris            Office
                         1300 I Street, Suite 125
                         Sacramento, CA 94244-2550
                BY:  **ROBERT D. WILSON**
                     **Deputy Attorney General**
                     **PETER K. SOUTHWORTH**
                     **Supervising Deputy Attorney General**


For Intervenors          Remcho, Johansen & Purcell, LLP
                         201 Dolores Avenue
                         San Leandro, CA 94577
                BY:  **JAMES C. HARRISON, Attorney at Law**
                     **MARGARET R. PRINZING, Attorney at Law**
                     KAREN GETMAN, Attorney at Law

```
 1  Monday, December 17, 2012
 2                                          10:16 A.M.
 3                    P R O C E E D I N G S
 4          THE CLERK:  Calling case 12-5713, Doe versus Harris.
 5  Counsel, please come forward and state your appearance for the
 6  record.
 7          MR. FAKHOURY:  Good morning, your Honor.  Hanni
 8  Fakhoury of the Electronic Frontier Foundation on behalf of the
 9  plaintiffs.
10          MR. RISHER:  Good morning, your Honor.  Michael Risher
11  of the ACLU of Northern California, also for plaintiffs.
12          MS. LYE:  Good morning, your Honor.  Linda Lye for the
13  ACLU, also for plaintiffs.
14          MR. TIEN:  Good morning, your Honor.  Lee Tien,
15  Electronic Frontier Foundation, also for the plaintiffs.
16          MR. HARRISON:  Good morning, your Honor.  James
17  Harrison on behalf of proposed intervenors.
18          MS. PRINZING:  Margaret Prinzing on behalf of proposed
19  intervenors.
20          MR. WILSON:  Good morning, your Honor.  Robert Wilson,
21  Office of the Attorney General for the Attorney General.
22          MR. SOUTHWORTH:  Good morning, your Honor.  Pete
23  Southworth also from the Attorney General's Office.
24          THE COURT:  Good morning to all of you.  Welcome.
25          You've received some questions that I am interested
```

1  in, and during the course of this proceeding I'll ask that you

2  answer those.

3          You may be seated.

4          I'll ask that you answer those questions to the

5  best of your ability.  And it's my practice, having told you

6  that, that if you don't answer I'll assume the worst in terms

7  of why you didn't answer it.

8          We have two motions.  Let's proceed first and argue

9  the motion to intervene.  Let's do that first, and I'm

10  primarily -- argue the motion as you came prepared to argue

11  it, but I'm -- well, let's go -- let's proceed with the

12  moving party.

13          **MR. HARRISON:**  Good morning, your Honor, James

14  Harrison on behalf of proposed intervenors --

15          **THE COURT:**  Let me ask you to stand at the mike here,

16  Counsel, and everyone.

17          **MR. HARRISON:**  Good morning, your Honor.  James

18  Harrison on behalf of proposed intervenors.  With me here today

19  in court is proposed intervenor Chris Kelly, along with my law

20  partners Margaret Prinzing and Karen Getman.

21          Your Honor, we have requested leave to intervene,

22  both as of right as well as permissive intervention.  I think

23  the briefs explain in great detail why we believe that

24  intervention as of right is appropriate.

25          However, the Court has focused its questions on

1  permissive intervention, so with the Court's permission I'd

2  like to address those questions, and if the Court has other

3  questions with respect to intervention as of right I'm happy

4  to entertain them.

5          **THE COURT:**  Okay.

6          **MR. HARRISON:**  The Court has asked whether proposed

7  intervenors meet the test for permissive intervention.  And as

8  the Court knows, there's three parts to that test:  One, an

9  independent grounds for jurisdiction; two, a timely motion; and

10  three, that the claim or defense shares a common question of law

11  or fact with the main motion.

12          The Ninth Circuit has made clear that intervenors do

13  not need to show any independent jurisdictional ground when they

14  are not raising new claims.  In other words, where the case

15  presents a federal question nothing more is required.  And

16  that's the *Freedom from Religion Foundation versus Geithner*

17  case, 644 F.3rd 836.

18          With respect to the second factor, timeliness;

19  proposed intervenors filed their motion five days after this

20  case was filed.  So even plaintiffs concede it was a timely

21  motion.

22          With respect to whether proposed intervenors share a

23  common question of law and fact with the main motion, in fact

24  the question is identical, and that is whether the state can

25  collect information from registered sex offenders regarding

1  their Internet identifiers and Internet service providers for

2  the purpose of investigating and preventing online sex crimes

3  and human trafficking consistent with the First Amendment.

4        The other factors that the courts evaluate with

5  respect to permissive intervention also militate towards

6  granting it.  Adequacy of representation is one of them; undue

7  delay or prejudice is another; and the third is whether

8  intervenor will significantly contribute to the development and

9  adjudication of the case.

10        Proposed intervenors meet each of these.

11        With respect to the adequacy of representation,

12  first, as the Court is aware, the California Supreme Court

13  has considered at length the case of whether the state

14  adequately represents the interests of the proponents of a

15  ballot measure, and it has concluded that even where the

16  state is defending the ballot measure, that it does not fully

17  represent the interests of the proponents.

18        And it also recognized that intervention by the

19  proponents of the ballot measure serves the purpose of

20  ensuring the judicial fairness of the process, the appearance

21  of fairness, and providing the Court with all of the

22  arguments that can be articulated in defense of the

23  constitutionality of the measure.

24        **THE COURT:**  Defendants have raised the Article Three,

25  that you fall short on the Article Three requirement.  What's

1  your response?

2          **MR. HARRISON:**  Sure.  With respect to Article Three,

3  your Honor, the Ninth Circuit --

4          **THE COURT:**  I mean plaintiffs.

5          **MR. HARRISON:**  Right.  The Ninth Circuit has not

6  resolved the question as the Court alluded to, as to whether

7  third party standing is required for permissive intervention.

8          But even assuming it were required, your Honor, we

9  believe that proposed intervenors satisfy it here, because

10  the California Supreme Court has found that the proponents of

11  a ballot measure represent the voters when they appear as

12  intervenors in a case.  So just as the state has standing to

13  defend the law, so too would intervenors.

14          In *Arizonans for Official English* the Court in

15  analyzing the question of whether the proponents of a ballot

16  measure had standing in that case noted that Arizona law did

17  not confer on them any right or responsibility to defend a

18  measure, and on that basis expressed grave doubts about

19  whether the intervenors in that case had standing.

20          Here at the request of the Ninth Circuit the

21  California Supreme Court has considered at length whether

22  proposed intervenors have the right to defend the state, and had

23  found that California courts had uniformly granted proposed

24  intervenors the right to intervene to defend the law.

25          And on that basis we believe that even if third

 1   party standing were required, the California Supreme Court

 2   has found such standing exists for purposes of California

 3   law, and the Ninth Circuit in the *Perry* case said that it

 4   would rely on the state's determination of that issue as to

 5   whether or not the plaintiffs -- excuse me -- the proposed

 6   intervenors could proceed.

 7          Obviously, the question that's before the U.S. Supreme

 8   Court now, your Honor, is slightly different because in both of

 9   the cases in which the court granted cert, the original

10   defendant chose not to appeal the case.

11          So the issue in that case appears to be whether

12   intervenors have Article Three standing to pursue an appeal

13   when the original defendant has decided not to appeal -- not

14   the question of whether an initiative's proponents have an

15   interest in defending an initiative sufficient to support

16   intervention.

17          And in fact, the U.S. Supreme Court in *Diamond*

18   *versus Charles* has acknowledged that there may be a

19   difference between standing for purposes of intervention and

20   standing for purposes of pursuing an appeal.

21          In that case the Court said that the intervenor's

22   right to continue to pursue a case in the absence of a party

23   on whose side it joined a case is contingent upon a showing

24   that the intervenor has Article Three standing.  The Court

25   didn't reach the question of whether Article Three standing

1   was required for intervention as of right, but the case at

2   least suggests that there may be a difference.

3          Obviously that issue will be resolved by the U.S.

4   Supreme Court in the Prop Eight case, but for present

5   purposes I think it's sufficient to say that that question is

6   not before the U.S. Supreme Court and plaintiffs -- excuse

7   me -- proposed intervenors here demonstrated both that they

8   have a protectable interest for purposes of Section 24 as

9   well as Article Three standing if the Court believes it's

10  required in order to intervene in this case.

11          **THE COURT:**  Okay.

12          **MR. HARRISON:**  Thank you, your Honor.

13          **MR. FAKHOURY:**  Good morning, again, your Honor.  I'll

14  begin by addressing the question the Court posed about the

15  standing issue, and I think it's important to be clear that the

16  uncertainty about Article Three standing is about intervention

17  as of right.

18          So in *Prete v. Bradbury* the Ninth Circuit made

19  clear that there was some disagreement among the circuit

20  courts about the need to find an independent Article Three

21  standing basis to allow intervention when the Court was

22  looking at Rule 24(a), intervention as of right.

23          But when it comes to permissive intervention it's

24  clear and the Ninth Circuit has been clear that there has to

25  be an independent basis of jurisdiction.

1          And in our papers we referenced both *EEOC versus*

2    *Pan Am World Airways* and *EEOC versus Nevada Resort*

3    *Association,* and both cases have made really clear that under

4    Rule 24(b) for permissive intervention there must be an

5    independent basis for jurisdiction.

6          I think related to that, your Honor, is when you

7    actually look at the Supreme Court's grant of cert in the *Perry*

8    case, I think it actually provides a stronger reason why this

9    Court should deny intervention, and that is, when the state

10   fails to defend an initiative on appeal, or when the state fails

11   to defend the initiative, in any court proceeding there's a

12   stronger reason to allow the proponents of a ballot initiative

13   to stand in place of the state.

14         And that's precisely what the California Supreme

15   Court held in the *Perry* decision and which the Ninth Circuit

16   eventually adopted in its *Perry* decision that is now on

17   review to the Supreme Court.

18         Here, however, obviously the state is present.  Beyond

19   that, they've adequately -- or they do adequately represent the

20   interests of the intervenors in two ways.

21         First there's -- as we've explained in our papers

22   there's a presumption that when the state is involved in the

23   suit and actually is defending the measure there's a

24   presumption that the -- that they share the same ultimate

25   objective as the sponsors of the initiative.

1          And there's a second presumption that says that

2   when the party to a litigation is the government body charged

3   with representing the interests of intervenor there's an

4   assumption there's this adequacy of representation.

5          So in effect, there's two presumptions here that

6   show that the state adequately represents two interests of

7   the intervenors in this case, and therefore intervention is

8   unnecessary.

9          The proponents have made a number of arguments in --

10  mainly in their reply belief explaining why intervention should

11  be granted, but I would note that those are strategic

12  differences.  There are strategic differences whether to oppose

13  the motion for anonymity.  There are strategic differences about

14  which arguments to focus on before your Honor in the substantive

15  pleadings.  But the Ninth Circuit again has been very clear that

16  strategic differences are not enough to overcome the presumption

17  of adequacy or enough to show that parties' representation is

18  inadequate.

19          Even -- and I noted this that in the reply brief the

20  proponents claim that the state failed to raise arguments about

21  the plaintiffs failing to demonstrate no circumstances in which

22  Proposition 35 could be constitutionally applied, but then admit

23  in a footnote that the state actually did raise that argument,

24  albeit in an abbreviated form.

25          So that's not enough to show that there's

1  inadequate representation, your Honor.  There's adequate

2  representation here and therefore formal intervention is

3  unnecessary.

4          We've made clear in our papers, your Honor, that

5  the plaintiffs have no objection to the proponents filing an

6  amicus brief.  There's no problem with the proponents

7  providing their expertise in the area to the state, whether

8  that's through helping them find expert witnesses or

9  providing suggested arguments.

10         And again, an amicus brief is the appropriate

11 avenue for the intervenors to express their thoughts,

12 opinions and overall feelings about this lawsuit.

13         **THE COURT:**  Let me ask you, given those concessions

14 you are willing to make, what's the vice of their intervening?

15 What more does intervention give them that we shouldn't -- that

16 you don't want in the case?

17         **MR. FAKHOURY:**  Well, it's really a matter of ensuring

18 that the litigation proceeds efficiently.

19         **THE COURT:**  I always thought that was something me and

20 my clerks worry about.  We get more papers to read.  We are

21 willing to do it.  It's my broad discretion to allow me to let

22 them in.

23         **MR. FAKHOURY:**  Well, your Honor, you certainly have

24 discretion, and all we've -- I think what our focus is on, all

25 we've -- our focus is on alerting the Court that in exercising

1  this discretion the Court obviously has to consider the adequate

2  representation.

3         Again, as I think we have made clear in our papers,

4  we think the state is doing an adequate job representing

5  their interests.  They've very zealously defended the

6  constitutionality of Prop 35.  We have no doubt they are

7  going to continue to do so throughout the course of the

8  litigation.

9         Yes, the Court obviously has discretion, and I'm

10 sure the Court will exercise it wisely.  But again, we would

11 just urge the Court to deny intervention, and I would be

12 happy to answer any other questions the Court has at this

13 time.

14         **THE COURT:**  I don't have any more.

15         **MR. FAKHOURY:**  Thank you, your Honor.

16         **THE COURT:**  Thank you, Counsel.

17         I'm going to take this under submission.  I'm

18 inclined to grant the motion, and in that regard I am going

19 to allow the movers for intervention to participate in this

20 hearing.  But I haven't ruled yet.  And I'll know how to sort

21 that out if I rule against you.

22         So with that, let's proceed with the main motion

23 here.  The moving party may proceed on that.

24         **MR. RISHER:**  Thank you, your Honor.  Michael Risher

25 from the ACLU.  I will be handling this portion of the argument.

1    Without further adieu I'll address the Court's

2 written questions, unless you'd like me to proceed in some

3 other way?

4         **THE COURT:**  No.  That's fine, Counsel.

5         **MR. RISHER:**  The first question relates to whether

6 this Court has the authority to narrow the statute to make it

7 constitutional.

8         And the answer is no.

9         The Supreme Court in *Grayned v. City of Rockford* said,

10 "It is not within our power to construe and narrow state laws."

11         Instead, the Ninth Circuit in the *California*

12 *Teacher Association* case -- both are cited in our briefs --

13 said that:

14              "This Court must use traditional

15              schools as statutory construction to

16              determine the statute's allowable

17              meaning."

18         Now, of course, this Court would be required to

19 accept a state court's authoritative construction of the

20 statute, but as the U.S. Supreme Court said in a case that we

21 haven't cited yet, *Virginia versus American Book Sellers*

22 *Association*, Reporter 484 U.S. 383, on page 395 made it clear

23 that:

24              "As the Attorney General does not

25              bind the state courts or local law

Christine A. Triska, CSR 12826
Pro-Tem Reporter -- U.S. District Court
(650) 743-8425

ER-0035

1          enforcement authorities, we are unable to

2          accept her interpretation of the law as

3          authoritative."

4          That's the same here in California.  As we pointed

5   out in our briefs, the Attorney General can't simply tell

6   local law enforcement what to do; can't tell local

7   prosecutors what to do.

8          There is, of course, a competing doctrine which

9   says that every court must avoid constitutional questions,

10  and therefore there is language in the cases -- American --

11  the *California Teachers Association*, the *Comite* case that

12  says, yes; the Court should adopt the constitutional

13  construction of the statutes, but it cannot do so by adding

14  language to the statute, by taking language out of the

15  statute, and it cannot do so by ignoring the usual tools of

16  statutory construction.

17         There seems to be a little bit of tension between

18  these two doctrines, but what I take from it is that the court

19  should look at the statute, give it its most natural reading.

20  In cases of true ambiguity the court should use the more

21  constitutional reading and reject the one that is

22  unconstitutional.  But aside from that, the Court simply looks

23  at the language and interprets it as it would any other statute.

24         The -- and I think that makes sense, because as the

25  Supreme Court pointed out, if this Court were to interpret the

1  statute very narrowly and uphold it on that basis there would be

2  no restriction on California courts, California officials

3  interpreting it more broadly and implementing it in a way that's

4  plainly unconstitutional.

5          The one solution, of course, would be certification to

6  the California Supreme Court.  However, California Rule of Court

7  8.548 does not allow a district court to certify the question.

8          The other possible solution would be to allow the

9  state courts to sort it out.  But the Supreme Court has made it

10 clear that when it says that the Court should adopt a "readily

11 available interpretation," it's talking about an interpretation

12 of the law that a state court in a single proceeding might come

13 up with.

14         And to the contrary, where you have a law like

15 this, one where there are many, many vague provisions, many

16 questions that would have to be -- or many words would have

17 to be construed narrowly, what you would end up with in the

18 state courts is a succession of prosecutions, and the First

19 Amendment will not tolerate that.

20         That's made clear in *Dombrowski*.  That's made clear

21 in another case that we didn't cite:  *Board of Airport*

22 *Commissioners of Los Angeles v. Jews for Jesus*, 482 U.S. 569,

23 and in the *American Book Sellers* case.

24         So I think at this point this Court's both

25 responsibility and the limit on its authority is to read the

1    statute as written.

2          The -- and I should add, specifically the Court asked

3    about the definition of "Internet service provider."  There are

4    many unanswered questions about that.  We've raised them in our

5    brief -- what's covered, whether it's an Internet cafe, it seems

6    to be pretty clear what that is.  Whether it's all traditional

7    Internet service providers, whether it is something like Best

8    Buy.

9          There are simply too many questions about the scope

10   of the definition of "Internet service provider," for this

11   Court to use the tools that it is authorized to use to

12   resolve them.  The statute is overbroad, it's

13   unconstitutionally vague, and it's unconstitutional for those

14   two reasons.

15         The Court's second question was much more specific:

16   Would it be permissible for the Court to construe the

17   requirement to provide a list of any and all Internet service

18   providers used by the person as only requiring Internet service

19   providers that are currently used or have an open account.

20         If the government advances this construction, I

21   think that is a permissible construction of the law.  It's

22   completely vague as to whether it's currently used.  I mean,

23   if they want to clarify they should say "currently used."

24         That is an area where the Court could legitimately

25   construe that statute as only applying to accounts that are

ER-0038

1  currently open.

2           That does raise the problem that I just alluded to:

3  There's nothing that requires state courts, state local law

4  enforcement to adopt that.

5           So it could be that we have a ruling from this

6  Court that the statute is constitutional because it's only

7  current accounts, and then state law enforcement and courts

8  reach a different conclusion.

9           The simple possibility that that would happen is a

10 problem under the First Amendment because of the chilling

11 effect that could have.  We need an authoritative

12 construction from a state court that that's the case before

13 anyone can be sure of what he or she must report.

14          The Court's third question was whether the scienter

15 requirement mitigates some of these problems.  And it certainly

16 is preferable to a strict liability offense, which would in

17 itself raise serious constitutional questions.  But it may

18 mitigate them.  It certainly does not resolve them, and for a

19 few distinct reasons.

20          Going back to what the Supreme Court has said about

21 First Amendment cases, in *Dombrowski*, 380 U.S. at 487, it

22 said, quote:

23               "The chilling effect upon the

24               exercise of First Amendment rights may

25               derive from the fact of the prosecution

1           unaffected by the prospect of a success or

2           failure."

3           *NAACP* says similar things where a prosecution --

4    where the threat of sanctions may deter the exercise of First

5    Amendment rights.

6           And in *Ashcroft v. ACLU* dealing with Internet

7    speech the Court was very clear -- this is 542 U.S. at 670 to

8    671:

9               "Where a prosecution is a likely

10              possibility yet only an affirmative

11              defense is available, speakers may

12              self-censor rather than risk the perils of

13              trial."

14          Now here we are not talking about an affirmative

15   defense, but the requirement that the government eventually

16   prove scienter is really -- is cold comfort to anyone who

17   might be caught up in this law.

18          The -- first of all, California courts have made clear

19   that probable cause to arrest, probable cause to institute a

20   prosecution, even to hold someone to answer, does not require

21   that the government have or the police a prima facia case.

22          Probable cause, as *Maryland v. Pringle* made clear

23   in holding when the Supreme Court held that if the police

24   finds some drugs hidden in a car they can arrest all the

25   occupants of the car, the government doesn't need to have

ER-0040

1  specific evidence that the person have the knowledge in that

2  case or the knowledge in this case.

3          So a registrant who doesn't know he has to register

4  a particular screen name or ISP, doesn't know that it falls

5  within the definition, can lawfully be arrested and

6  prosecuted.

7          Now, yes, the government has the burden to prove

8  beyond a reasonable doubt that he knew of his duty to

9  register.  As a former public defender I can only imagine a

10 registrant who might have a strike or two, who might be

11 looking at serious time, knowing that if he goes to trial the

12 jury is going to find out that he is a registered sex

13 offender.  If he takes the stand to show that he didn't know,

14 to say that he didn't know, he may well be impeached with the

15 fact of his prior convictions.

16         The prosecutor will be able to bring in a piece of

17 paper that the registrant is required to sign under Section

18 290.015(a)16, where the registrant has acknowledged his duty

19 to comply with his registration requirements.

20         Jurors are not going to be sympathetic to that

21 defense, and yes, there's a chance you can prevail with that

22 sort of defense.

23         But it would be unwise, to say the least, for

24 someone in that situation to go to trial and risk spending

25 years in prison based on his being able to convince the jury

1  that he didn't understand his duty to register.  Jurors will

2  say, "Well, you should have played it safe.  You know you're

3  in this peril."

4        So the scienter requirement is important, but it's

5  certainly not dispositive -- far from it.  The risks of

6  prosecution are simply too great.

7        The next question the Court addressed to us is whether

8  speech by sex offenders is entitled to the same level of First

9  Amendment protection as anybody else, and what types of speech

10 could be prohibited by the government.

11       And I think the answer is someone who has been

12 convicted of an offense of whatever type, has completed his term

13 of imprisonment or supervised release or probation or parole, is

14 absolutely entitled to the same First Amendment rights as

15 everybody else.

16       When you look at cases from various courts -- the

17 Ninth Circuit included -- that address free speech rights of

18 persons on probation or parole the Court never suggests that

19 the mere fact of the conviction somehow extinguishes or

20 limits those rights.  It's the fact that the person is

21 currently being supervised.  And just as they are subject to

22 a search clause, just as they are subject to restrictions on

23 their movements, their First Amendment rights can be limited

24 because they are serving a sentence.

25       Once they are done, they are not subject to search

1    and seizure anymore, they are not subject to the types of

2    limitations on the First Amendment that could be imposed on a

3    parolee.

4            The Supreme Court's closest case on this I think is

5    *Simon and Schuster* dealing with the Son of Sam Law.  People

6    in that case, most of them, had been convicted of crimes or

7    at least admitted crimes as part of -- in the book.  That was

8    a triggering requirement for the law.

9            The Supreme Court never suggested that the fact

10   that people had been convicted of crimes somehow made it okay

11   for the government to impose these restrictions.  The

12   restrictions there were simply that they couldn't immediately

13   profit on the sales of books related to their crimes.

14           If, in fact, the Supreme Court had been inclined to

15   create some sort of exception for people convicted of crimes,

16   we think they would have taken that opportunity in *Simon and*

17   *Schuster* to do it.

18           To the contrary, if you look at more recent cases

19   like *United States v. Stevens*, which we cite in our brief,

20   involving the animal cruelty videos; *Brown versus*

21   *Entertainment Association*, which we don't cite, but it's a

22   recent case involving violent video games, the Supreme Court

23   has made it crystal clear in those cases it is not going to

24   expand the categories of unprotected speech beyond

25   obscenity -- *Brandenburg* standards.  Speech that is used, in

1    fact, to commit a crime such as conspiracy or attempt.

2         And similarly, I think it's made clear that because

3    there is no historical precedent for stripping people of

4    their First Amendment rights simply because they've been

5    convicted of some crime long ago, it's not going to expand

6    exceptions to the First Amendment to allow the government to

7    do that.

8         And for good reason.  If we could strip people who

9    have been convicted of their First Amendment rights, we as a

10   society would lose a perspective on the criminal justice

11   system from those who have a unique perspective, who have

12   been subject to it, who can tell us about prison conditions,

13   who can tell us about the difficulties they face reentering

14   society.

15        We lose an important viewpoint if the government

16   can restrict those people from speaking.  We lose an

17   important viewpoint here if, in fact, registrants are chilled

18   from speaking about their experiences with the criminal

19   justice system and the registration system.  They have the

20   same First Amendment rights as does everybody as soon as they

21   successfully complete parole or probation or whatever

22   supervised release they have.

23        The Court's next question is whether the government

24   can legitimately use the Internet-related information to monitor

25   registrant's speech in the absence of a specific criminal

1  investigation, whether surveillance is a permissible purpose.

2        The statute needs to be clear that surveillance is

3  a permissible purpose under the statute.  The California Sex

4  Offender Management Board report makes it clear that law

5  enforcement agencies do engage in this sort of surveillance.

6  There's certainly no restriction in the statute on the

7  government's ability to use registration information to

8  engage in surveillance.

9        Now, of course, under the First Amendment and its

10 protections for anonymous speech that is, in fact,

11 prohibited, but the statute purports to allow it.

12       And that's related to the Court's next question, which

13 is if surveillance is not permitted by the statute, what says

14 so?  And the reality is there's nothing in the statute that

15 disallows surveillance.  There is nothing in the statute that

16 disallows the government from disseminating that information to

17 the public, although it can't use the Internet to do that.

18       In fact, the purpose of 290 -- Section 290 has been

19 repeatedly -- the courts have repeatedly said is to allow the

20 police to conduct surveillance on registrants.  That's the

21 entire purpose of registration.  And there's nothing in the

22 statute that limits that longstanding purpose with respect to

23 the information the registrants would have to provide under the

24 CASE Act.

25       The Court's next question is if such surveillance is

1  permissible, what makes it permissible not with respect to

2  people who are not on probation or parole?  I think I've

3  addressed the statutory basis for that.

4        And do the cases upholding sex offender

5  registration generally stand for the proposition that sex

6  offenders can be subject to speech surveillance?

7        No.  And the Tenth Circuit said so in *Doe v. City*

8  *of Albuquerque* where the government said, "Well, we can keep

9  registrants out of our public libraries because look at all

10 these other cases that have upheld registration requirements

11 and disclosure requirements."

12       And the Tenth Circuit quite sensibly said, "Those

13 cases don't involve the First Amendment.  The First Amendment

14 is different."  The fact that you can put -- and this goes to

15 the second part -- information about somebody on the Internet

16 doesn't mean you can restrict his free speech rights.

17       And the Ninth Circuit when it upheld Washington

18 State's registration laws in *Russell v. Gregoire* -- we cite

19 this in our brief, but it's also 124 F.3rd at 1094 -- made

20 clear that the reason -- and discussed in the U.S. Supreme

21 Court case, *Doe v. Alaska* -- the reason it was upholding

22 these registration and notification requirements is because

23 it only involved information that was already a matter of the

24 public record for all of us: license plate numbers, your

25 names, the various aliases you might use.

1          Residence, they said was close to the line.  But

2   again, where you live, your residence is something that the

3   government knows.  The Post Office knows where you live.  The

4   Post Office doesn't and shouldn't be able to know what online

5   speech we would like to engage in anonymously, what online

6   discussion forums we are involved in, and I'll get to what is

7   exactly covered by this law in a moment.

8          So those other cases are not relevant to this.

9   This is a First Amendment case, and the First Amendment is

10  different.

11         So the next question is one that's -- assume for the

12  purpose of argument that there's no risk of public disclosure of

13  the RSO's Internet identifiers.  Is that the end of the First

14  Amendment claim?

15         And the answer is "no" for two distinct reasons.

16  First of all, anonymity is concerned with official

17  retaliation, retaliation by the government; and second of

18  all, just the reporting requirements impose a burden.

19         To take those in order, when the U.S. Supreme Court

20  first started looking at anonymous speech and the right to it

21  in *Talley v. California* it set forth several distinct reasons

22  that anonymity is a constitutional right.  And the first one

23  it listed, the one it discussed most in *Talley*, where, as the

24  dissenters point out, there was absolutely no evidence or

25  even reason to think that the -- I don't know -- that Ms. or

ER-0047

1  Mr. Talley would face any social ostracism or social

2  retaliation for advocating a boycott, which is what she was

3  doing.

4          Instead the U.S. Supreme Court focused on the

5  history of official retaliation under the Crown and in other

6  governments where people's concern was that if they didn't

7  write anonymously or sued anonymously the government would

8  retaliate against them.

9          So that is completely separate from disclosure.  It

10  doesn't depend on disclosure.

11          Similarly in *Shelton v. Tucker* -- we cite it in our

12  brief, but it's 364 U.S. at 486 -- which involved requiring

13  public teachers to turn over information about their association

14  with various groups, the Supreme Court said, and I quote:

15              "Even if there were no disclosure to

16              the general public, the pressure upon a

17              teacher to avoid any ties which might

18              displease those who control his

19              professional destiny would be constant and

20              heavy."

21          First Amendment rights are fragile.  The Supreme

22  Court has told us this many times.

23          Here we don't have an employment relationship.  We

24  have something that puts registrants in an even more

25  vulnerable position.  They face numerous ways in which the

Christine A. Triska, CSR 12826
Pro-Tem Reporter -- U.S. District Court
(650) 743-8425

1   police could retaliate against them, if they were so -- the

2   government in general, if they were so inclined --

3           **THE COURT:**  If they were what?

4           **MR. RISHER:**  There are many ways that the police or

5   the government in general can retaliate against registrants,

6   even without releasing their Internet information to the public.

7           The government, for example, could simply

8   release -- put up posters, as we know it has done in the

9   past, saying that "So and so is a registered sex offender.

10  Beware."  That's entirely within it's authority to do.  We

11  know that 39 percent of the responding agencies in that

12  survey have done something like that.  If they didn't like a

13  particular registrant, well, they could do that.

14          Registrants are not popular among law enforcement.

15  They are not popular among the general public.  Many law

16  enforcement agencies would simply prefer not to have them

17  living in their jurisdiction, and it's very easy to subject

18  them to all sorts of retaliation, which affects not just

19  their jobs, as in *Shelton v. Tucker*, but their entire lives.

20          Law enforcement, as Charlene Steen notes in her

21  declaration, can make a registrant's life unbearable.  She

22  doesn't say that, but that's I think the effect of what she

23  does say.

24          These are people who may face official retaliation,

25  and that is, under the Supreme Court's opinions in *Talley* and

1    in *McIntyre*, a separate reason to protect anonymity, putting

2    aside any disclosure to the public.

3                Also --

4                **THE COURT:**  If an RSO by definition has to register,

5    why isn't all of this true right there without, what is this?

6    They can retaliate when they register?  "Ah, we got one.  Let's

7    get them."  What's the difference in this legislation?  What

8    does it add to the ability to retaliate?

9                **MR. RISHER:**  It adds the ability to retaliate based on

10   protected speech, and that's the difference.  It doesn't -- it

11   may not -- assuming for a moment that the government cannot

12   release any information related to Internet use, it -- the

13   government retains the same ability to make a registrant's life

14   difficult, to put it in a neutral way, by releasing a variety of

15   information to the public, by increasing the surveillance on

16   him, by going to his employer and talking to people.

17               But now the government can do that based on its

18   monitoring of an offender's Internet speech, which is

19   something it couldn't do before.

20               And that makes it categorically different, because

21   in general the government can certainly take all sorts of

22   steps with respect to a registrant -- with any of us -- that

23   don't violate the constitution.  They may inconvenience us,

24   but we don't have a right not to have the government do that,

25   unless it is doing it because of First Amendment protected

1  activity.  So it's retaliation for protected speech that

2  makes this different.

3         And the final thing I'll say here, unless the Court

4  has more questions -- and I'm happy to address them on this

5  topic -- in *Perry v. Schwarzenegger*, 591 F.3rd 1147, the Ninth

6  Circuit -- we discussed this in our brief -- the Ninth Circuit

7  considered throughout whether a protective order that limited --

8  that was of course disclosure of political affiliations of

9  people who were involved either on the for or the against

10 Proposition Eight's same sex marriage ban.  And the Ninth

11 Circuit said, no, that information need not be turned over in

12 discovery because it's protected by the First Amendment.

13 Conditional privilege.

14        And yes, a protective order that prevented it from

15 being disseminated beyond the lawyers involved in the case

16 would mitigate these concerns, but they wouldn't mitigate it

17 enough to make it permissible.

18        So we have the Ninth Circuit saying that even very,

19 very limited disclosure that's not going to go beyond a very

20 small group of people still is the type of disclosure that

21 the First Amendment protection is for, not -- in that case

22 confidential campaign communications; in this case anonymity.

23        So the next question is what limitations are there on

24 the means by which law enforcement can disseminate an RSO's

25 Internet identifiers and ISPs to the public?

1          There's also, how do law enforcement entities

2   determine that public dissemination is necessary to ensure

3   the public safety?

4          I can't answer that second one.  It doesn't seem

5   that there are any standards that say what that exactly is

6   supposed to mean.  We know that it is routinely --

7   information is routinely disseminated.

8          As to the first part of that question, Section

9   290.45 says they can disseminate that information.  Quote:

10              "By whatever means the entity deems

11          appropriate when necessary to ensure the

12          public safety based upon information

13          available to the entity concerning that

14          specific person."

15          Certainly the Attorney General's office on their

16   website and local law enforcement interpret that to allow

17   them to release information.  It's impossible to say

18   exactly -- for me to say what the internal decision making

19   is.

20          What I can say is that there's no limitation on

21   what information can be released.  Subsection B of 290.45

22   says:  "Information may be provided -- may include but is not

23   limited to," and then lists a whole bunch of information.

24          So it's clear that they can provide, in addition to

25   the list of things which are name, aliases, gender, race,

1   description, any other information they want to provide,

2   which necessarily includes the information that's been

3   collected under here.

4          And Subsection D says that they are immune from

5   civil liability if they act in good faith.  Presumably that

6   would not cover situations where they -- where they -- the

7   registrant was able to show retaliation.  Again that's maybe

8   cold comfort to someone whose life might be upended by having

9   information -- the information, that is the sex offender, or

10  information related to his Internet use released.

11         So I'm happy to -- if the government has a better

12  explanation of what information can be released to respond to

13  that.

14         The next series of questions relates to whether

15  specific online user names or ISPs would have to be reported.

16  And some of them are very clear and some of them are borderline.

17         The first one is online banking user name, and that

18  depends on your bank.  So I think the answer is for Wells

19  Fargo, which I use, and does not have a chat function, the

20  answer is no.

21         However, I did some research and found that perhaps

22  the biggest bank in California in terms of customers, Bank of

23  America, does have a user help chat option that is --

24  probably counts as a chat room under the definition of an

25  Internet identifier, and most definitely counts as instant

 1    messaging if you look at paragraphs 30 to 32 of the Post

 2    declaration.  He describes exactly what those two terms mean

 3    in common parlance.  And for that bank at least there's

 4    actually two potential Internet identifiers that you might

 5    have.

 6          So I have printouts of the website that I've given to

 7    the intervenors and the government.  If you'd like to -- I can

 8    hand them up if you'd like.

 9          **THE COURT:**  If you could do that, yeah.

10          **MR. RISHER:**  Yes.

11               (Whereupon, counsel hands the

12                    documents to the clerk.)

13          **MR. RISHER:**  The second one is Best Buy.

14          **THE COURT:**  Thank you, Counsel.

15          **MR. RISHER:**  So at the bottom of this first page this

16    talks about, how do I start a chat section?  This is for the

17    record a printout of the "Bank of America Frequently Asked

18    Questions; Ways to Contact Bank of America."

19          On the second page, "What can I chat about once I've

20    signed into online banking?"  And another heading half way down

21    the page, "Why can't I chat with you about my existing accounts

22    without signing into online banking?"

23          So the way this works is you can always chat with a

24    representative even if you don't have an account -- an online

25    Internet identifier.  However, if you want to chat about certain

1    topics, your certain accounts, you need to have bank log-in,

2    which you then use for the purpose of having that instant

3    message or chat.

4        So anyone who wants to do that, ask information

5    about their accounts through Bank of America's chat help

6    function, that would be an Internet identifier under the

7    terms of the statute with very little question.

8        There's an additional Internet identifier, however,

9    that you have to establish whenever you chat with them, and this

10   will become clear when I talk about Best Buy.  Bank of America

11   and most of these chat functions seem to operate the same way.

12       Each new chat session, help session that you want to

13   initiate, a new box opens up.  And you'll see the second page

14   that shows a common log-in for Best Buy and requires you to put

15   in more information -- your name, and they ask -- the name on

16   the Best Buy form is mandatory.  E-mail and phone are optional.

17       These are the types of transient screen names that

18   Professor Post talks about in paragraph 64 of his declaration

19   that squarely fall under the definition of "Internet

20   identifier."  They are names that you are establishing to engage

21   in chatting/instant messaging -- whatever is the better way to

22   describe that, and you have to establish a new one every time

23   you use the function.

24       So if I -- this creates an enormous burden for someone

25   who might again go into Best Buy rather than the bank, have a

1 problem with the product and want to engage in a series of chat

2 helps over a day or a week. Every time that person logs in for

3 a new chat session he is establishing -- necessarily

4 establishing a new Internet identifier, and would have to then

5 turn that over to the government under the plain language of

6 this statute.

7        **THE COURT:** But if I'm to give Prop 35 a reasonable

8 interpretation, how would I say that it's -- in order to reduce

9 the threat created by resident sex offenders, this is designed

10 to get those RSOs who are stalking bank employees? That makes

11 no sense. Why would I give it that interpretation?

12        **MR. RISHER:** Because that's what the language of the

13 statute says. And I agree with --

14        **THE COURT:** This is the plain language reading.

15        **MR. RISHER:** Yes. Yes. This is not a marginal case.

16 There are some marginal cases. Yeah. If this were a state

17 court you could maybe add some words or take them out, but this

18 Court cannot do that.

19        So the next potential screen name is an Amazon.com

20 user name, which is actually quite similar to -- analytically to

21 a New York Times user name, and the -- the reviews and help

22 forums -- Kindle help forums on Amazon.com's website clearly

23 qualify as Internet forum discussions. Professor Post discusses

24 that at paragraph 28, and it is 100 percent clear that somebody

25 who is posting on one of those forums, even making comments on a

1   product or asking questions about it, he or she can use her

2   Kindle that is -- that person has created an Internet

3   identifier.

4        The more difficult question is whether if you simply

5   log onto your account and are looking at a product and then look

6   at the reviews, whether that counts as an Internet identifier.

7   And that's the exact same issue with respect to the New York

8   Times.  Although you would likely be talking about different

9   things.

10       And here the reason for the statutory ambiguity -- and

11  I don't know what the government's position is on whether that

12  would be required to post, because it would also apply

13  potentially to Myspace accounts.

14       If you open a Myspace screen name but you never

15  actually use it to put out information, whether you are just

16  monitoring it, I don't know what the government's position is

17  on whether that is something that registrant's must report.

18       But here's the ambiguity in the statute.  The

19  statute says you have to -- defines Internet identifiers as

20  names -- don't use that word -- used for the purpose of

21  Internet forum discussions, without saying whether it's used

22  for the purpose of contributing or speaking on Internet forum

23  discussions, or used for the purpose of reading or monitoring

24  Internet discussions.

25       I think that either one of those is a reasonable

1    interpretation of the statute.  And it's maybe the same

2    question of, if I join a conference call but I don't speak a

3    word, am I using my telephone system for the purpose of that

4    conference call?  I think it's inherently ambiguous.

5            So I think in that situation it is a reasonable

6    interpretation of the statute to say that, no, it only counts

7    once you actually use that account to post something, to

8    speak.

9            However, there are two potential problems with

10   that.  The first one again is that we don't know how the

11   state courts and -- yeah, how the government will interpret

12   that.  They could want it to be used if you are looking at

13   posts on the grounds that that's part of surveillance; not

14   just what you are saying but also what you are seeing, what

15   you are reading.

16           Even if that's not an issue there becomes a

17   difficulty, because the statutory language doesn't seem to

18   require reporting if somebody opens an Amazon account and

19   doesn't intend to post or doesn't post, and we say that

20   that's not something that they must report, but then they

21   decide to report -- excuse me -- they decide to post

22   something on it, well, they are not changing a screen name.

23   They are not establishing a new screen name.  So it doesn't

24   seem as if the 24-hour notification requirement would cover

25   that situation.

1          So it seems that if, in fact, you interpret this
2     law not to require notification when they simply establish
3     the account, that they -- the purpose of the law is thwarted,
4     because then there's no -- they don't have to report it until
5     their next annual registration update, because they are
6     neither establishing nor changing an account.
7          Maybe the government has an interpretation of the
8     law that gets around that problem.  The plain language of the
9     statute seems to make that a paradox.
10         Best Buy user names is almost exactly like Bank of
11    America.  And I've submitted -- the second page I submitted was
12    a handout from -- was a printout of the Best Buy chat log-on
13    where again you can engage in customer service, chats/instant
14    messaging.  Every time you do so you have to establish a new
15    user name and provide that to Best Buy.  Under the plain
16    language of the statute you would have the nonsensical duty to
17    report that.
18         User names used for blogging.  This is where things
19    maybe get a little more difficult in one respect.
20         So there are two types of blogs -- there are more
21    than two types of blogs -- but two general types of blogs
22    relevant here, and Professor Post discusses them in paragraph
23    28 of his declaration, subparagraphs A and S.
24         A simple blog that allowed someone to post new
25    information but had no interactive features would probably

1    not qualify as an Internet identifier.  However, as Professor

2    Post points out, most blogs do have an interactive feature,

3    and they therefore count as online forum, Internet forum

4    discussions, squarely covered by the statute, and many of

5    them also have social networking functionality.

6         So although in theory a registrant could find a

7    blog platform that did not allow for this interactive

8    discussion, and have a blog without, I think, reporting that

9    as an Internet identifier the majority of blog platforms

10   would require that that be reported, because they are

11   Internet forum discussions by any meaning of the term.

12        And finally, an old e-mail address or Myspace user

13   name associated with an account that the RSO does not use or

14   check, it's ambiguous.  The statute does say "used or

15   established by the registrant."

16        So I would -- I think there's a good argument that

17   the better reading of the statute since "established" must

18   mean something different than "used," that because it has

19   been established in the past they must report it.  However

20   that's not the only reasonable reading of this statute.

21        If they don't have to report it, it does raise that

22   same problem that if they resume using this it does not

23   appear that the 24-hour notification requirement kicks in,

24   and so that would -- to the extent that that actually has a

25   legitimate -- that has some utility, then the statute is

1  underinclusive because a reading of the statute that allows

2  this information not to be reported eviscerates that utility,

3  if that makes sense.

4          **THE COURT:**  Okay.

5          **MR. RISHER:**  And the final question relates to law

6  enforcement officers' access, need to know, right to know

7  policy.

8          The statute -- I don't know what that policy is.  The

9  government, of course, is in a better position to address this.

10  The statute clearly gives law enforcement agencies access to

11  this information.  I don't know what the Attorney General policy

12  is.

13          The next one is kind of hard:  What's your best

14  argument this is a class-of-speaker regulation triggering strict

15  scrutiny?

16          I hope my best argument is the one that we tried to

17  make in the brief, but I have a slightly different version of

18  it now, and that further research found that the Supreme

19  Court has said this, quote:

20                  "The government can exclude a speaker

21              from traditional public forum only when

22              the exclusion is necessary to serve a

23              compelling state interest and the

24              exclusion is narrowly drawn to achieve

25              that interest."

1          That's *Arkansas Education Television Commission v.*
2  *Forbes*, 523 U.S. 666 at page 677.

3          Okay.  That certainly is scrutiny, and that's the
4  Supreme Court -- maybe in dicta, although other cases have
5  turned that into holdings -- saying that excluding a particular
6  speaker from a public forum gets strict scrutiny.

7          The Fourth Circuit has taken that at its word.  An
8  en banc opinion called *Warren v. Fairfax County*, 196 F.3rd
9  186 at page 190 overturned a residency -- a restriction that
10 prohibited nonresidents from speaking in a particular park
11 and cited *Forbes* for strict scrutiny.

12         The Connecticut Supreme Court has done the same
13 thing.  A policy that excluded nonresidents from a local park
14 said that *Forbes* required strict scrutiny.  That's *Leyton v.*
15 *Town of Greenwich*, 777 A.2nd at 552, a 2001 case.  Also
16 collects a number of other cases in that opinion.

17         So I guess maybe the best argument that we should have
18 made is the Supreme Court has said it.  And it's repeated that
19 much more recently, albeit in cases that also involved some
20 types of content discrimination in *Citizens United*.  And it also
21 expanded on why laws that discriminate among speakers are just
22 as bad as laws that discriminate by content.

23         And, in fact, one of the fundamental reasons that
24 we have strict scrutiny, that the courts apply strict
25 scrutiny to content discrimination is because, as the Supreme

1    Court said in *Citizens United*, you don't want to drive

2    particular viewpoints out of the public discussion.

3            And speaker discrimination is, as Citizens United put

4    it:

5                    "Speech restrictions based on the

6                    identity of the speaker are all too often

7                    simply a means to control content."

8            130 Supreme Court at 899.

9            I mean, you look at the Minneapolis Star or the

10   Arkansas Writers Project, if the government -- if the mayor

11   doesn't like a newspaper -- the biggest newspaper in town,

12   well, you pass a tax on ink and have an exemption so it only

13   applies to a particular newspaper that's been critical of

14   you.

15           It's that sort of speaker discrimination that

16   can -- it's a more direct way of doing what the government might

17   try to do indirectly with content discrimination of getting at

18   disfavored speakers, speakers who have disfavored viewpoints and

19   shutting them out of the conversation.

20           Although *Citizens United* does discuss content

21   discrimination, that's not the thrust of the case.  The real

22   thrust and controversial holding of the case, of course, is that

23   the government can't discriminate against corporations or among

24   corporations when free speech is involved.  Nobody was

25   saying -- the corporations' complaint wasn't that other people

ER-0063

1    were -- well, it wasn't that the government was suppressing

2    their content.  It was the government was treating them

3    differently than it was treating a media corporation or a

4    private speaker.

5            Putting aside the question of corporate speech

6    rights, it can't be that the First Amendment prohibits the

7    government from discriminating against an individual because

8    of its corporate structure, but it allows it to discriminate

9    against a natural person because of who he is.  I mean, that

10   seems to be the central holding of *Citizens United*, and the

11   Court comes back to it repeatedly, albeit mixed in with a

12   discussion of content discrimination, and says, the First

13   Amendment does not tolerate laws that discriminate among

14   people.

15           And that makes sense, because again, what better

16   way to drive particular view points out of the conversation

17   than to exclude people who have them?

18           So if in fact -- if a state were to respond to

19   *Citizens United* and say, "We won't do anything with content

20   discrimination.  These certain corporations that have a net

21   profit every year of such and such are not," or "whenever they

22   speak on the Internet they must turn that information over to

23   the government" -- a law somewhat similar to what we have here,

24   but instead of singling out registrants, it singles out certain

25   corporations, disfavored corporations, unpopular corporations --

ER-0064

1    probably not as unpopular as registered sex offenders, but

2    nevertheless unpopular, I have little doubt that under *Citizens*

3    *United* the Court would have to strike that law down under strict

4    scrutiny.

5            The final reason I think strict scrutiny is merited is

6    it's clear that there's some heightened scrutiny for laws that

7    discriminate among speakers.

8            And when the First Amendment is involved there are

9    really only two levels of scrutiny.  You have intermediate

10   scrutiny that applies to all laws, whether it's *O'Brien* or

11   *Ward*, and then the only level of scrutiny that is higher than

12   that is strict, as far as I'm aware of, putting aside

13   commercial speech, which isn't an issue here.

14           And so if it's something higher than intermediate

15   scrutiny I think it has to be strict scrutiny.  And I think

16   that the Court has made clear that it is -- speaker

17   discrimination raises concerns beyond time, place, and

18   restrictions that get intermediate scrutiny, so it must get

19   something more.

20           The question of -- *Buckley*, of course, dealt with

21   public disclosure, and so why is disclosure just to the

22   government so bad?  And I think I've discussed that with respect

23   to the prior question, but there are a couple of things that

24   I'll add.

25           *Talley* and *McIntyre* both discuss official

 1  retaliation as something different from economic boycotts or

 2  social ostracism. *Shelton v. Tucker* made that even clearer.

 3         The -- I guess the only different thing I have to add

 4  is that *McIntyre* compares the right to anonymity in speech as

 5  the right to a secret ballot. How would we feel about a law

 6  that said the government, the police get to read our ballots

 7  that we cast in an election?

 8         They can't disseminate them to the public, but I

 9  think we would all agree that that was a grievous

10  infringement on the right to a secret ballot. Similarly it's

11  an infringement on the right to anonymous speech if the

12  government gets that information, even if they don't

13  disseminate it.

14         The 24-hour reporting requirements. It's significant

15  for two separate reasons. First of all, it is a burden in the

16  common sense of the term. People who create new screen names,

17  people who use Internet cafes have 24 hours to report that

18  information to the government or face being arrested and

19  prosecuted.

20         Maybe it would be very easy for them to do that in

21  some circumstances. If they are traveling, if they can't

22  necessarily get the information of the Internet service

23  provider in an easy way, if they want to make a comment on a

24  newspaper website but they just don't want to be bothered

25  reporting that information to the government, or they are

 1  offended that they have to report it, it becomes burdensome

 2  for them to do so.  People will simply not speak, because

 3  they don't want to go through this process of reporting it to

 4  the government.

 5           Now, we don't know exactly what the government's

 6  plans are to get that information within 24 hours.  Maybe

 7  they can ameliorate that.  But it's nonetheless a burden.

 8           *Simon and Schuster* says it's an unconstitutional

 9  burden to delay payment or possibly not receive payment for

10  books you are reading.  The threat of prison if you don't

11  report something within 24 hours seems at least as great a

12  burden.

13           It also means that registrants who want to speak

14  online for more than 24 hours must either give the police

15  their Internet identifier long before they are done speaking,

16  to the extent that that's a legitimate reason to distinguish

17  between pre- and post-identification under the Tenth

18  Circuit's ruling in *Doe*, or they have to pick a new Internet

19  identifier every day, which of course would be incredibly

20  burdensome.

21           And that I believe is the last of the questions that

22  the Court directed to the plaintiffs.  I'm sure I'll have

23  responses to what the government has to say, but I'm also happy

24  to address any other questions that the Court has right now.

25           **THE COURT:**  None at this time.

1          **MR. RISHER:**  Great.  Thank you, your Honor.

2          **THE COURT:**  How are you doing, Madame Court Reporter?

3          **THE REPORTER:**  I'm okay.  I'm all right.

4          **THE COURT:**  You're okay?

5          **THE REPORTER:**  Yes.

6          **MR. WILLIAMS:**  Would you like to address the questions

7   one after the other or each a presentation?

8          **THE COURT:**  During the course of your presentation,

9   just as counsel did.  It's up to you.

10         **MR. WILSON:**  May we both approach?

11         **THE COURT:**  You may.

12         **MR. WILSON:**  Thank you.

13         **THE CLERK:**  Just make sure you speak into the

14  microphone.

15         **THE REPORTER:**  Would you identify yourself again for

16  me?  Thank you.

17         **MR. WILSON:**  Yes, I will.  Robert Wilson on behalf of

18  the Attorney General.

19         **THE REPORTER:**  Thank you.

20         **MR. WILSON:**  Thank you, your Honor.  Beginning with

21  Question Number One:  If the Court concludes that the CASE Act's

22  definition of "Internet service provider" is vague or overbroad,

23  can the Court construe the definition narrowly in order to save

24  it?

25         The answer to that is yes, we say.

1        If so, how do you propose the Court construe it?

2        We would be agreeable to the manner the Court had

3    proposed in Question Number Two, which is to limit it to

4    Internet service providers with which the registrant has an

5    open account at the time of the registration.  And that fits

6    exactly within the statutory definition, because it says in

7    the statute accounts -- businesses that are providing

8    computers and Internet access.  It doesn't say "provided" or

9    "will provide."  It's the ones that are active at that time.

10        So there's -- I believe plaintiffs' counsel raised

11    some ideas of ambiguity.  There are no ambiguities with respect

12    to the plain language of the statute.  That's clearly -- I mean,

13    the statute first of all says it right on its face, "providing."

14    But the Court's proposed limiting instruction falls directly

15    within that framework.  So that's fine.

16        Question Number Three -- sure.

17        **MR. HARRISON:**  If I could just briefly add a thought

18    there, your Honor.

19        First of all, the Ninth Circuit has made clear that

20    federal courts are permitted to construe ambiguous state

21    statutes and to extrapolate their true meaning according to

22    traditional rules of statutory construction.  That's *The*

23    *Center for Bioethical Reform versus LA County*, 533 F.3rd 780.

24        Traditional rules of statutory construction, of

25    course, include looking beyond the text in order to ascertain

 1  the intent of the drafters and avoiding constructions that

 2  would lead to absurd results.  We agree with the Attorney

 3  General's Office that in response to Question Number Two the

 4  use of the word "account" in the statute makes clear that it

 5  only applies to ongoing contractual relationships.

 6          **THE COURT:**  Okay.

 7          **MR. WILSON:**  Robert Wilson.  Question Number Three:

 8  Does 290.018's scienter element mitigate the effects of any

 9  ambiguity with regard to the CASE Act's reporting requirements?

10          The answer to that is yes.  Because before a

11  registrant could be prosecuted under the statute there would

12  have to be a willful failure to not provide that information

13  to law enforcement.

14          And we cited a case in our briefs by the title of

15  *Aragon* in which a fellow moved his trailer onto the property

16  of relatives and did not identify that as a change in

17  address.  And it was held there that that -- because of the

18  scienter requirement he didn't know that he was required to

19  do that.  He couldn't be prosecuted for failing to register.

20          There's one other thing here, your Honor, that we've

21  not found in any of the decisions, and I think it's very

22  important.  And that is, this is an unusual situation in which

23  the registrant works hand in hand with law enforcement to fill

24  this form out.  In all cases except for the new one, the 24-hour

25  reporting requirement in which they can submit it by mail.  But

1   in all other cases they have to physically go to their local law

2   enforcement agency and sit down face to face with a law

3   enforcement officer and fill the form out.

4           Now, there's absolutely no way a registrant could be

5   prosecuted for failing to register one of these things if you

6   ask law enforcement about it and law enforcement doesn't answer

7   or tells them it's not required.

8           So what makes this unusual is it's not a situation

9   in which a person is wringing their hands over whether they

10  were going to be prosecuted for failure to do something

11  without having any prior contact with the law enforcement

12  agency that would theoretically prosecute them.

13          You are going in there ahead of time, face to face

14  with law enforcement, filling out a form that the Department

15  of Justice prepares -- fill in the blanks -- and if there's

16  any questions the registrant can simply ask.

17          There's absolutely no way that we can think of in

18  which a registrant can be prosecuted for willfully failing to

19  do that, unless -- unless he's told -- are you on a chat room

20  or some interactive communication with the public?  And we

21  need to know that, and he willfully withholds that, that's a

22  different story.

23          But it's not going to be a situation in which a

24  registrant goes to law enforcement and is confused about

25  whether they should put something in.  They are going to

1  know.

2      So that's the reason that that mitigates the effect of

3  any ambiguity with respect to the reporting requirements.

4      Question Number Four:  Is speech by sex offenders

5  entitled to the same level of First Amendment protection as

6  speech by anyone else?

7      We are in agreement with plaintiffs' counsel on

8  that.  They are entitled to it.  Especially when they're --

9  after they've served probation and parole and they are out in

10  the public.  So there's not a dispute there.

11      What types -- this was not answered by plaintiffs'

12  counsel I don't recall.

13      What types of speech could RSOs be undertaking on

14  the Internet that would not be fully protected under the

15  First Amendment?

16      And the answer to that is criminal speech, one of

17  which is solicitation to commit a crime.  That's not

18  protected under the First Amendment.  And so -- and that

19  applies to all of us in this room -- in this courtroom.  I

20  mean, it's the same for everybody.  You cannot anonymously

21  get on the Internet and solicit a crime and expect to be

22  entitled to First Amendment protection for that.

23      **MR. HARRISON:**  We certainly agree that there is no

24  different First Amendment standard.  But I do think it's

25  important to put the sex offender registration laws themselves

ER-0072

1  in context, because plaintiffs have already lost a significant

2  degree of anonymity under the existing law as a result of their

3  status as convicted sex offenders.

4           So under existing law, for example, they are

5  required to report their name, their aliases, their address,

6  their photograph, their physical description, and all of this

7  information is available to the public on the state's Megan

8  Law website.

9           So what that means is that when a registered sex

10  offender stands on a soap box in a park to make a political

11  speech a member of the public could identify him as a registered

12  sex offender by linking his physical appearance to his

13  photograph and his name on Megan's Law website.

14          The same is true, for example, if a registered sex

15  offender were to use an alias to submit a letter to the editor

16  expressing his political views on an issue.  A member of the

17  public could link the author of that letter to the registered

18  sex offender by comparing his alias to his true name on the

19  Megan's Law website.

20          So to some degree Prop 35 is less intrusive of

21  plaintiffs' right to anonymity for several reasons:  One, as

22  plaintiffs' counsel concedes, the information is not posted on

23  the state's website; two, Prop 35 by its terms as set forth in

24  its Statement of Findings and Declaration of Purpose restricts

25  the use of the information to tracking and preventing online sex

1    crimes and human trafficking; and third, law enforcement can

2    only make the information available to the public if it makes a

3    determination that it's necessary to ensure public safety based

4    upon information related to that specific sex offender.

5            So to the extent that reporting Internet

6    identifiers and Internet service providers raise questions,

7    they cast out on the entire registration system.  After all,

8    these Internet identifiers are used in public settings.  It's

9    information that is available when you go on a chat room and

10   you communicate with someone else; your identifier is right

11   there.  So I think it's important to remember the context of

12   the law as we discuss these issues.

13           **MR. WILSON:**  That's a good segue I think, your Honor,

14   to Question Number Five and to some of the ones that follow

15   which address the question about monitoring registrants' speech.

16           The first question is, can we do that on the

17   Internet?  Can we legitimately do that on the Internet in the

18   absence of a specific criminal investigation?

19           And the answer from our perspective is no.  And so

20   here we apply normal criminal law procedures and laws

21   regarding surveillance.  So in that regard there has to be

22   -- and this comes from the statute itself.

23           The purpose of Prop 35 as articulated in the

24   introduction, and as it fits into Section 290, the overall

25   purpose of which is to monitor sex-related offenses against

1    children and women, in order to properly surveil somebody an

2    officer has to have a specific -- has to have specific and

3    articulable facts that are objectively reasonable.  And it

4    can't be based on mere curiosity, rumor or hunch.

5              So what we are saying here is that an officer

6    cannot get -- first of all, let me draw one other distinction

7    and that is between private communications and things like

8    Facebook.

9              For private communications, even if law enforcement

10   has the Internet identifiers, they can't get to the content of

11   that unless the judiciary says they can.  Because you have

12   subpoena or a court order or a warrant.  So there's some

13   judicial review before a law enforcement officer can get to

14   private communications.

15             The big question is, what could law enforcement do

16   with a registrant's Internet identifier in something like

17   Facebook?

18             The idea there is that the statute itself limits it to

19   the purpose of protecting against crimes against children and

20   kidnapping and solving those crimes once they've happened.

21   That's the extent of the authority of law enforcement to use

22   those Internet identifiers.

23             In order for them to link somebody on Facebook to a

24   registrant there would first have to be some kind of nexus

25   created by the open and public content of Facebook which alerts

1  law enforcement to the fact that a crime may be about to be

2  committed.

3          For example, somebody says, "Father of a young boy

4  looking for like minded people," or "Please -- here I am.

5  Please meet me at such and such a location if you are under 14,"

6  or something like that.  Something which triggers in law

7  enforcement's mind that there's a problem that comes up.

8          And let's say that communication on Facebook, which

9  is open to everybody in the world, is tagged by an identifier

10  by the name of "John 54."  It's an anonymous identifier.

11  Only if something comes up which creates that nexus and cause

12  for investigation could law enforcement legitimately go into

13  the database.  And right now they have to go through DOJ to

14  get it by written request.  Only then could they try to link

15  or find out if John 54 is a registered sex offender or not.

16          But outside of that they can't use the information.

17  And Penal Code 290.45 subjects them to criminal and monetary

18  penalties.  There are also penalties available in just normal

19  personnel disciplinary proceedings.

20          And a side note here on that:  When law enforcement

21  runs somebody on a check and they do it through CLETS, the

22  California Law Enforcement Telecommunication System, that

23  goes through the Department of Justice and the DOJ audits

24  those requests.  And what they do is they randomly go back

25  and say, "Officer Wilson, on such and such a day you ran a

1    request on Joe Smith. Explain to us why you did that and

2    show the proof that you needed that." So there's an auditing

3    process already in place that looks for things like that and

4    makes officers justify them.

5            One other important note here, and then I'll turn it

6    over to the intervenors, which is just like the registrants,

7    when an officer does something on the Internet or uses a

8    computer there's a record. There's going to be a record

9    somewhere. It's going to be date/time stamped over who looked

10   at what and what was looked at. And so they are just as

11   susceptible as anybody else to being found out if is something

12   improper has happened.

13           And that auditing capability that we have gives us

14   the opportunity to go in and investigate that if somebody

15   raises a complaint that they think they were improperly

16   looked for by law enforcement.

17           This is the -- I was just asked to provide the cite.

18   The language on the requirements for surveillance came out of

19   CAL JUR. Let's see if I can find that for the Court.

20           Oh, here it is: 13 ALR 3rd 1025.

21           **THE COURT:** Thank you.

22           **MR. HARRISON:** The construction proffer by the

23   Attorney General, your Honor, is similar to the construction

24   that was adopted by the 10th Circuit in the *Shurtleff* case.

25   There the Court acknowledged that the statute could be read

1   broadly to permit monitoring of registered sex offenders on the

2   Internet for any purpose.  But it concluded that it could read

3   the law narrowly to permit the state to use the information only

4   in the context of a criminal investigation.

5           And here, your Honor, Prop 35 itself states that the

6   purpose is to allow law enforcement to track and prevent online

7   sex offenses and human trafficking.

8           So a reading of Prop 35 that would authorize law

9   enforcement to use the information to monitor for any purpose

10  at all would be inconsistent with the intent of the statute.

11          **MR. WILSON:**  I think, your Honor, that addresses

12  Question Six and Seven together, unless you have any other

13  questions.

14          Number Eight.  Assume for the purposes of argument

15  that there is no risk of public disclosure of the RSO's Internet

16  identifiers.  Is that the end of the First Amendment (as opposed

17  to the vagueness) claim?  And plaintiffs' answer to that was no.

18  Our answer is yes; right?

19          Because this is -- in my mind this is exactly like

20  the *Buckley* case where the petition circulators had to file

21  an affidavit with the government which identified themselves

22  and who they were and all of that but were not required to

23  put a name tag on when they were out circulating the

24  petitions.

25          That's not a chilling of speech just

1   because -- there's a case cite too, and perhaps my colleague

2   here will have it.  But just because the government collects

3   information on something doesn't mean that that's a chilling of

4   the speech.

5           And so we would say that is the end to the First

6   Amendment claim.

7           **MR. HARRISON:**  I believe counsel was referring to the

8   Tenth Circuit's decision in *Shurtleff*, where the Court citing

9   the U.S. Supreme Court said:

10              "In none of those cases, however, did

11              the chilling effect arise merely from the

12              individual's knowledge that a governmental

13              agency was engaged in certain

14              informational gathering activities."

15          I would also point out in *White versus Baker*,

16  another case in which the Court reviewed sex offender

17  registration law in the reporting of Internet identifiers,

18  including passwords, the Court said:

19              "The mere delivery of information

20              regarding Internet identifiers to law

21              enforcement doesn't inhibit free speech.

22              It's not a free speech gateway requirement

23              and doesn't implicate the First

24              Amendment."

25          And I think it's also important to note that misuse of

1  this information under California law is subject to both civil

2  and criminal penalties.  Plaintiffs' counsel raised a parade of

3  potential horribles regarding misuse of the information.  But

4  that's already subject to existing sanction and could be the

5  subject of a 1983 action if it were to occur.

6       **MR. WILSON:**  Those penalties, your Honor, are one of

7  the reasons -- one of the limiting -- excuse me -- one of the

8  limitations on release of information to the public has to be

9  for a proper purpose which is public safety directed toward a

10  specific individual.

11       And the plaintiffs cited to the Sex Offender

12  Management Board study, 39 percent of the responding agencies

13  said that there was proactive notification.  But they don't say

14  what is released or why or what the purpose was.  And of those

15  39 percent, actually only 22 percent of the total state agencies

16  responded.  So that 39 percent figure -- I'm not really sure how

17  that's going to fit in.

18       But I think there's a more fundamental question here,

19  which is the purpose I believe of notification to the public is

20  to be able to locate a sex offender in the community.  I don't

21  really see how releasing Internet identifiers to the whole world

22  is going do that.  Photograph -- yes, maybe.  Car, license

23  plate -- maybe, for sure.  Place where he's expected to live or

24  lived -- those sorts of things do that.  I just can't see a

25  situation in which an officer would release Internet identifiers

1  to the public at large.

2          Now, I think there's -- it's not a think, it's a for

3  sure, the National Center for Missing and Exploited Children has

4  a checklist for investigators on what to do when a child is

5  abducted.  And the checklist for the first responder includes

6  two important things that are important to that case, one of

7  which is the investigator is supposed to check with the parents

8  to see if the child was on the computer, to get the computer and

9  look at it and see if there's anything suspicious about what was

10 said or done on the computer, especially teen chat room and chat

11 sites.

12         The second component that's interesting that they ask

13 of first responders is to check to see if there are registered

14 sex offenders in the area.

15         Those two things are critical to investigating the

16 abduction of a child, and the national center has said if

17 that child is not found within the first three hours it's not

18 likely they are going to be found alive.  So time is of the

19 essence when that situation happens.

20         That's a situation that I can foresee in which law

21 enforcement were to release Internet identifiers to the mother

22 and father -- something of that nature; right?  Limited to one

23 person but not to the general public at large.

24         How do they determine that public dissemination and

25 information about an RSO is necessary to ensure public

1  safety?

2          The determination is made I think when they are

3  looking for somebody or they need to alert the public at

4  large about a person who may be in the community.

5          But a good example of that actually happened -- I

6  think there are two examples in San Diego in which notifications

7  were put out regarding sexually violent predators, but nothing

8  was released to the Internet.  Nothing can be released on the

9  Internet.  It has to be done personally or by flyers or things

10  of that nature.

11          **MR. HARRISON:**  I would also add, another limiting

12  factor on law enforcement's ability to release information to

13  the public again is in Prop 35 itself which specifies that its

14  purpose is to be used to track or prevent online sex crimes and

15  human trafficking.

16          So in addition to meeting the standard imposed

17  under existing law that law enforcement determine that the

18  information is necessary to ensure public safety, they would

19  also have to satisfy the requirements of Prop 35.

20          The Court has asked a number of questions regarding

21  the use of online user names and identifiers, and the first

22  question goes to an online banking user name.

23          As I mentioned earlier, the Court does have an

24  obligation to use traditional rules of statutory construction to

25  construe the law, if it finds it vague.

1           In this case the Court should be guided by two rules;

2    one ascertaining the intent of the drafters, in this case the

3    voters; and two, avoiding an obstruction -- excuse me --

4    avoiding a construction that would lead to an absurd rule.

5           The purpose of Prop 35 is to strengthen the

6    registration laws to give law enforcement a tool to investigate

7    and to prevent online sex crimes.

8           And the definition of "Internet identifier" has to be

9    read in that context.  The definition provides that a registrant

10   has to report e-mail addresses, user names, screen names or

11   similar identifiers used for the purpose of Internet forum

12   discussions, Internet chat room discussions, instant messaging,

13   social networking, or similar Internet communications.

14          All of these are examples of interactive

15   communications between a registrant and other members of the

16   public.  Construing the law to require a registrant to report

17   an online bank user name or any other user name that's used

18   in a private commercial transaction would be inconsistent

19   with the intent of the law, because it would not support the

20   purpose of investigating and preventing online sex crimes.

21   That's not the forum in which they occur.  They occur in

22   forums in which other members of the public are present.

23          And furthermore, it would lead to an absurd result.

24   The law enforcement authorities don't need to know the online

25   bank user name of sex offender registrants in order to carry

1   out their duties under the law.

2          I would also just like to point out that it is

3   reasonable to read the definition established or used to mean

4   "identifiers" that the person actually creates him or herself as

5   opposed to those that are automatically generated.  So I will

6   just briefly go through the others with that framework in the

7   mind.

8          An Amazon.com user name would not be required

9   unless the registrant uses that name to engage in interactive

10  discussions on Amazon, such as by posting comments.

11         The same is true with the New York Times user name.

12  If a registrant uses a user name to post comments he would have

13  to disclose it.  If all he's doing is reading content but not

14  posting anything he would not.

15         Best Buy user name -- again, he would not be

16  required to disclose it unless he uses it to post comments.

17         With respect to user names used for blogging, if

18  the blog permits interaction with other users then yes, he

19  would have to report it.

20         And finally we agree with plaintiffs that an old

21  e-mail address or Myspace user name that is not currently

22  being used would not be required to be reported.

23         MR. WILSON:  A couple of brief comments on that, your

24  Honor.  Plaintiffs' counsel's other -- first let me go back a

25  second, because I thought that the Court's questions there

1  harken back to the questions about monitoring; right?

2          So the Court might say, "Well, how could somebody

3  who is posting something on the New York Times newspaper or

4  Amazon or Starbucks, how could they be involved in child

5  trafficking, or how would that fit, or how would that work,

6  and how would law enforcement get to that?"

7          This goes back to the Facebook example that I

8  mentioned, which is there has to be some nexus with criminal

9  conduct before you can even go get the Internet identifier to

10  figure out who this person is.

11          I think there have been examples.  A good example

12  is online gaming.  I think there's an online game -- I don't

13  do online gaming so I might have to defer to my son, but it's

14  "World of War Craft" or something like that.

15          But essentially predators get on these online games

16  and then they invite kids offline.  "Boy, you are really good

17  at that game.  Why don't we meet about how to do this?  I'll

18  be at a Motel Six at such and such a time."  That's a way in

19  which that can happen, and that's the way it's tending to

20  move.

21          And so the idea behind the examples that the Court

22  gave are if a registrant has an intent to engage in

23  interactive communications of that sort we would want to have

24  that Internet identifier.  Not so that we can monitor what

25  they are doing, purchasing their groceries or their books or

1  whatever, no.  But to create that nexus in case something bad

2  does pop up somewhere that looks like it's suspicious and we

3  can figure it out.

4          So it's not like we're going to be getting on

5  Amazon.com and following a registrant to see everything he

6  does or any of those other things.

7          Starbucks -- let me just mention Starbucks real

8  fast.  Based on some research I did a couple of days ago I

9  think Starbucks has its own chat site but you create an

10 account for that.

11         And so registering that account is not a problem of

12 telling law enforcement every Starbucks you went to in the

13 last six months; right?  It's giving them that account name.

14 Then you could go to every Starbucks in America if you want.

15 If you are chatting through that account and that anonymous

16 name to set up meetings with kids or women, then that's a

17 problem.

18         But again, law enforcement is not monitoring

19 anything without there being some nexus to some kind of

20 possible criminal activity.

21         And the last point on that, plaintiffs' counsel

22 mentioned the 24 hour requirements.  What about a registrant who

23 wants to just read something and so they are not posting stuff

24 out but they are just reading?  That would not create a problem

25 for us, or we won't even really know, right, unless they post

1    something out?

2            But if a registrant created an account and thought,

3    "Well, I'm going to wait 25 hours and then I'm going to get

4    on it and post it, right, so I'm not subject to the 24-hour

5    requirement because I'm just reading it for 24 hours, that's

6    not going to work.

7            But what I'm saying here is that the 24-hour

8    requirement is not really a problem.  They could sign up an

9    account.  They don't do anything for six months, but then they

10   start chatting on it, then we got to know about that.  That's

11   something they can do by mail just sending the form in.

12           Number 11 is probably mine also, your Honor.

13           Officers' access to registrant's information as

14   governed by a need to know/right to know policy.  What governs

15   law enforcement officers' need to know and right to know?

16           We discussed that pretty much at length with respect

17   to the civil and criminal penalties in 290.  There are --

18   California Government Code 1990 says that a state official can't

19   use public information for private purposes.  That would subject

20   them to disciplinary proceedings.

21           In the typical course of disciplinary proceedings

22   if the conduct is egregious, that means termination right out

23   of the gate.  So those are some pretty significant penalties.

24           That said, in order for a law enforcement officer

25   to query our CSAR database, that's C-S-A-R, California Sex

1  and Arson Registry, like a lot of computer systems you have

2  to go through a screen, check an "agree site" or page -- face

3  page which lays out the law and says "If you use this

4  information improperly you can be subject to civil and

5  criminal penalties" and that sort of thing.  So they have a

6  need to know and right to know to even get into it.

7        And again, presently when an officer runs a check

8  on somebody that's subject to auditing by the Department of

9  Justice and a request for justification on why they do that.

10       **MR. HARRISON:**  Your Honor, could I just briefly

11 respond to the question you posed to plaintiffs about strict

12 scrutiny?

13       **THE COURT:**  Which number is that?

14       **MR. HARRISON:**  That is Number One:  What's your best

15 argument that this is a class-of-speaker regulation triggering

16 strict scrutiny?

17       **THE COURT:**  You may briefly.

18       **MR. HARRISON:**  I will be very brief.

19       First of all, your Honor, this is not *Citizens*

20 *United*.  This is not a case where a restriction is based on

21 the content of the speech or the viewpoint of a speaker.

22 *Citizens United* involved a situation where the government was

23 giving preferential speech rights to some noncorporate

24 speakers at the expense of others, corporations, and it was

25 in the context of core political speech for which First

1  Amendment scrutiny is particularly robust.

2            This case is closer to *TBS versus FCC*, where the Court

3  concluded that the law which applied to cable operators, not

4  network television operators, must-carry provision was neutral

5  even though it distinguished between cable operators and others,

6  because it made that distinction based upon the manner in which

7  the programmers transmitted their image, not the content of the

8  message that they carried.

9            This is very similar.  It's a regulatory scheme

10  that serves legitimate purposes wholly removed from the

11  content of the registrant's speech.  So strict scrutiny would

12  not be justified here.

13            **MR. WILSON:**  Would the Court like to continue or to

14  take a short break?

15            **THE COURT:**  Would you like a break?

16            **THE REPORTER:**  Yes, I would.  Thank you.

17            **THE COURT:**  All right.  We'll take a 10 minute break.

18            **THE CLERK:**  Court is in recess for 10 minutes.

19                 (A recess was taken at 12:15 p.m.)

20            **THE CLERK:**  Please be seated and come to order.  Court

21  is now back in session.

22            **THE COURT:**  Let's resume when you are ready, Counsel.

23            **MR. WILSON:**  Thank you, your Honor.  Thanks for the

24  break.

25            We are at Question Number One for the defendant on

 1  page four.  And the lead in is:  The overarching issue that

 2  presents itself with regard to the tailoring of this statute

 3  is how the information gained through the CASE Act's

 4  reporting requirements would help combat human trafficking

 5  and/or sex crimes?

 6         For instance -- and Question A is directed to the

 7  state:  You assert that this statute will help you protect

 8  innocent victims, particularly children from predatory

 9  Internet activities.  How so?

10         There are three ways in which it does that, your

11  Honor, one of which I've already mentioned, which was the

12  abduction problem in which time is of the essence.  Having

13  that information is a critical tool for law enforcement to be

14  able to find that child within three hours.  That's the goal.

15         The second way in which it will protect children from

16  predatory Internet activities is through covert operations, and

17  that's where law enforcement engages itself in --

18                    (Cell phone interruption)

19         **MR. WILSON:**  I've never seen that happen to a judge.

20         **THE COURT:**  You would be sanctioned if you did.  Sorry

21  about that.

22         **MR. WILSON:**  That's encouraging.

23         So the second one I was talking about was covert

24  operations, and that's a situation in which law enforcement

25  might be scanning through some of the social network sites or

1   chat room sites looking for things in which people might want

2   to prey upon children.  And the way that they do that is

3   presenting themselves as an underage girl or boy and

4   arranging for meet-ups.

5          So if a registrant responds by the name of John 54,

6   for example, law enforcement could scan the database and find

7   out if that person is a registered sex offender.  So that

8   will give him some helpful information.

9          And that leads to the third way, really, it's runs

10  throughout the whole statutory scheme I think.  Proposition 35

11  gives law enforcement just one more tool that they can use to

12  compile information to try to help solve crimes.  That's the

13  predominant purpose.  And to the extent that they engage in

14  covert operations or they see something about to happen, it can

15  help them prevent them.

16         **MR. HARRISON:**  You asked us, your Honor, in concrete

17  terms how law enforcement could use sex offenders' Internet

18  identifiers to determine whether the e-mail address for example

19  of a person belonged to a sex offender.

20         Two examples, your Honor:  One is provided in the

21  declaration of Sharmin Bock.  She described a case in which

22  the mother of two 13-year-old girls contacted police because

23  her daughters had been lured to a meeting and subsequently

24  abducted and trafficked for sex.

25         The predator used the Internet to engage them, and

1  if she had been able to provide the Internet identifier to

2  the police they could have requested the Attorney General's

3  office to compare that identifier with those belonging to

4  registered sex offenders to determine whether there was a

5  match.

6          A second example is one that Rob referred to earlier,

7  and this is a real life case involving World of War Craft.  This

8  is a circuit case in which the predator used an online game,

9  World of War Craft to engage in communications with a teenage

10  boy, and as a result of the interaction between the two, the

11  predator began to send sexually explicit messages to the teen

12  and then to threaten him.

13          If the predator's screen file or Internet identifier

14  had been available to law enforcement, again, they could have

15  compared it to the list of registered sex offenders' identifiers

16  to determine whether there was a match, and if so, they could

17  have used it to prevent an attempted kidnapping.

18          The next question you asked, your Honor, is about how

19  law enforcement will be able to quickly identify and investigate

20  suspects when presented with evidence that a crime involving the

21  use of the Internet to facilitate trafficking or sexual

22  exploitation of children has been or is about to be committed.

23          Again, the theory is the same.  Law enforcement can

24  use the information to check the database for a match.  This is

25  similar to how law enforcement uses the existing information

 1  they have in their database to investigate other sexual crimes.

 2          So, for example, when a rape occurs law enforcement

 3  will check the database to see whether any registered sex

 4  offenders live in the neighborhood in which the rape

 5  occurred.  So it's a tool, as my cocounsel mentioned, that

 6  law enforcement can use to quickly initiate an investigation.

 7          The next question you posed relates to the

 8  prophylactic purpose of requiring registered sex offenders to

 9  turn over their information, and you have asked what the

10  fact-based evidence we have that supports this.

11          Unfortunately, the state obviously hasn't implemented

12  Prop 35 yet, so we don't have any data to compare pre-Prop 35

13  statistics with post-Prop 35 statistics so we cannot present the

14  Court with any factual evidence.  However, the California

15  Supreme Court recognized in *In Re Alva* that sex offender

16  registration does have a deterrent effect.

17          The next question you've asked is how knowing a

18  registrant's Internet service provider could be of use to law

19  enforcement.

20          Law enforcement with that information could issue a

21  subpoena to the Internet service provider if they have reason

22  to believe that a registered sex offender has committed a

23  crime to obtain information about the registrant, including

24  the IP address linked to his account.

25          So, for example, police could link the e-mail

Christine A. Triska, CSR 12826
Pro-Tem Reporter -- U.S. District Court
(650) 743-8425

ER-0093

1   address used to facilitate human trafficking or grooming of a

2   child to a registered sex offender.  They could then check

3   the database to determine whether the registered sex

4   offender's Internet service provider created a match.

5           **MR. WILSON:**  The next question, Number Two, your Honor

6   is, is there any connection between these provisions and human

7   trafficking?

8           And the answer to that is yes.  The connection is

9   that the overwhelming majority of human trafficking involves

10  trafficking for sex related offenses and mostly children.

11  And that's the connection between these two things.

12          The Attorney General just recently published a

13  report, "The State of Human Trafficking in California," dated

14  2012, and we would be happy to provide that to the Court as a

15  proffer of evidence in a supplemental declaration if the

16  Court deems it necessary.  But there is evidence out there

17  that human trafficking is directly related to sex related

18  offenses.

19          In fact, we met with a senior official of our

20  investigative department, and she told us that -- this is

21  hearsay, right?  But she told us that the term "human

22  trafficking" is just another term for child prostitution, and

23  they are used interchangeably between people that are engaged

24  in that type of business.  So that's the connection.

25          Is there evidence that RSOs are more likely to be

1  human traffickers than non-RSOs?

2          And to that we would simply point to plaintiffs'

3  own declarations.  I think it was the declaration of Mr.

4  Abbott who mentioned -- and counsel has some other

5  statistics -- but Mr. Abbott mentioned that four percent are

6  likely to reoffend, and there was a reference in there, too,

7  that 52 percent of pedophiles of young boys are likely to

8  reoffend.  So that's the relationship, your Honor.

9          **THE COURT:**  Okay.

10          **MR. HARRISON:**  One other quick point in response to

11  that question, your Honor, Prop 35 itself added to the list of

12  crimes requiring registration, human trafficking.  So that's

13  another link.  That's in an amendment to 2090(c).

14          Your next question goes to the use of an Internet

15  service provider provided in an Internet cafe.

16          As we've discussed earlier, the definition of

17  "Internet service provider" relates to a provider with whom a

18  person has an account to access the Internet.  So if the

19  Internet cafe requires that the person establish an account,

20  then the person would have to report the cafe as an Internet

21  service provider.

22          On the other hand, if a person obtains cable

23  services to watch television from Comcast but not Internet

24  service, he wouldn't have to report Comcast.

25          **THE COURT:**  Okay.

1    **MR. WILSON:**  Question Number Four:  What types of

2  online communications by RSOs would it be most helpful to law

3  enforcement to be able to monitor?

4    The decision in *White* addresses that.  And it

5  basically says there that it's -- Internet chatting and social

6  networks and chat rooms were the experience that that Court had

7  with sites that were most helpful, that mostly involved the

8  exploitation of children.

9    Number Five:  How can speech posted on publicly

10  accessible (without a log-in) websites and forums such as the

11  New York Times or the Reform website be used to commit sex

12  crimes?

13    And as I mentioned earlier that's a situation in

14  which a registrant might invite someone to go offline.

15  Because I think the reality is, is that these offenses happen

16  because an innocent child is groomed.  So first you have to

17  establish some sort of relationship.  You can do that

18  seemingly innocently, and then it continues from there.  But

19  that's how those things could be used.

20    Would somebody use the New York Times' site to do

21  that?  I don't know how probable that is, but the possibility is

22  there.

23    Do you want to add anything to that?

24    **MR. HARRISON:**  Two quick points, your Honor.  We cited

25  the case to the Court, *U.S. versus Cervini* where there the

1   predator actually posted child pornography on an Internet news
2   site.  Though it seems implausible, it has in fact occurred.
3        I think it's also important to take a look at the
4   New York Times' privacy policy which makes clear that if
5   readers choose to engage in public activities on a site that
6   the information they provide can be used by other readers to
7   send them unsolicited messages.
8        So again, though it may seem unlikely that it could
9   be a forum for a predator, interactive communications on a
10  website can lead to offline discussions as the predator
11  attempts to groom his victim.
12       **MR. WILSON:**  Last question, Number Six.  And this is a
13  good one.  It is, could the CASE Act's goals be achieved if its
14  registration requirements applied to a narrower class of RSOs,
15  such as those who were at high risk of reoffending, or those who
16  used the Internet to commit a sex offense in the past?
17       And our answer to that is no, and the reason is
18  because they serve different purposes.
19       A risk assessment like Static-99 is used by parole
20  officers and courts to estimate the risk that a person might
21  pose when they are released to the community.  And that
22  information, if it's posted on Megan's website, would also help
23  the community assess the risk that a particular person might
24  pose.
25       Prop 35's Internet identifier registration

1  requirements serves a different purpose.  The purpose of that is
2  to be able to find somebody if we need to.  They are not really
3  related.
4         Now, Section 290.5 -- I believe that's the
5  section -- of the California Penal Code is a mechanism by
6  which individuals convicted of these offenses can be relieved
7  of the registration requirements altogether.
8         So there's a mechanism in the Penal Code that
9  allows the lower-risk offenders to exempt themselves from
10  registration altogether.  That already exists.
11         The way that that statute reads, though, is -- it says
12  if you -- see, if I can get this right -- if you have not
13  committed one of these offenses, then you can be exempted.  So
14  you have to go through that whole statute and cross-reference
15  them to the crimes that they relate to.
16         But those -- in that section those are the ones
17  that can't be exempted.  Essentially they are the ones for
18  people who have committed these offenses using fear or force
19  or violence.  So they are the harder -- harder commitments.
20         The registrants in California are subject to that
21  and subject to lifetime registration, and Prop 35 is nothing
22  more than just another location information type tool for law
23  enforcement to use.
24         But they are unrelated to risk.  And we should not
25  forgo the opportunity to find someone if we need to simply

1  because somebody thinks that they have a low risk score.
2  They are different purposes.  And, you know -- I remember
3  what I was going to say.  Sorry.
4        The additional burden on the registrants is
5  negligible, because in every case except when they were
6  reporting by mail they have to show up in person and walk
7  through the form with law enforcement anyway.  We are talking
8  about filling out two blanks on a four-page form that they
9  already have to fill out.
10        So allowing law enforcement to gather that
11  information to make sure that we can find them if we need to
12  is absolutely critical.  And hopefully they'll never have to
13  use it on a lot of the people, but we need to be able to have
14  it to make those links in case something happens.
15        **MR. HARRISON:**  The entire premise of sex offender
16  registration laws is that there's a danger of recidivism, and
17  that the information recorded by registrants can be a useful
18  tool for law enforcement to prevent and investigate sex crimes.
19        Plaintiffs' own statistics speak to this risk: 14 to
20  20 percent recidivist rate generally; 52 percent for molesters
21  of boys, 39 percent for rapists of adult women.
22        The problem, your Honor, with narrowing the
23  registration requirement is that we don't know who among that
24  14 to 20 percent will be the recidivists.  And given the
25  relatively light burden on sex offenders to provide two

1   additional pieces of information balanced against the

2   importance to law enforcement of having access to this

3   information to try to quickly investigate and prevent a crime

4   if possible against children we think the balance clearly

5   tips towards the state's interest.

6          **THE COURT:**  And is that what I'm doing, Counsel,

7   balancing the purpose of this legislation against the things

8   that the plaintiffs are complaining about?

9          **MR. HARRISON:**  Ultimately, your Honor, of course, in

10  determining whether or not to issue a preliminary injunction,

11  yes, that's what you are doing.  And we think the balance weighs

12  heavily in favor of the state.  Thank you.

13         **THE COURT:**  Thank you.

14         **MR. WILSON:**  One brief comment on that, your Honor.

15  Even if the Court decided the likelihood of success on the

16  merits was 50/50, the balance still weighs in our favor, because

17  simply having that information available to prevent a child

18  abduction to help solve a crime after it's happened is a

19  significant, significant state interest, and nobody anywhere has

20  contested that.

21         So as opposed to plaintiffs' claims, we think the

22  balance really weighs in our favor.

23         Thank you, your Honor.

24         **THE COURT:**  Thank you.  Let's be brief, Counsel.

25  We've gone far beyond what I usually do on my motions.   I

1    usually hear four or five motions in this short a period.

2           **MR. RISHER:**  I'll be brief.

3           The government and the intervenors are essentially

4    asking this Court to rewrite the law, to exclude certain

5    websites, to add other -- to say, "No.  You can't narrow it

6    in this way.  You should narrow it in this way."  Ultimately

7    they said, well, the registrant will work with the police and

8    they will figure out what sites need to be submitted or what

9    identifiers.  That is completely contrary to the due process

10   clause.

11          *Morales versus Chicago*, among other cases, says you

12   can't give the police that sort of discretion.  That's doubly

13   true when you are talking about First Amendment freedoms.

14          The government and the intervenors are caught in a

15   bind.  They recognize the statute as written I think is

16   overbroad.  But the narrowing construction that they ask the

17   Court to undertake doesn't comport with the plain language of

18   the statute, and it introduces additional intolerable vagueness

19   problems.

20          To be brief, going back to or addressing for the first

21   item the efficacy argument, I still don't understand how this

22   regimen is going to increase the government's ability to solve

23   crimes more than the powers they already have.

24          They can submit a subpoena duces tecum to an ISP.

25   They can submit a subpoena duces tecum to a website.  It

ER-0101

1   sounds as if they are still contemplating that they will have

2   to do that in order to use this.  I just don't see the added

3   efficacy.  That is a factual question.  They have a burden

4   under *Turner*.  I don't think that they have met it to show

5   that this is effective.

6           Whether or not there's some balancing test, whether

7   or not as the Supreme Court suggested in *Stevens* our First

8   Amendment is more absolute, they haven't satisfied their

9   burden there.

10          And that's particularly ironic I think that in the

11  tiny number of cases where a registered sex offender actually

12  plans to use an Internet identifier to commit a crime -- and

13  remember, only four percent of online sex crimes involve

14  registrants.  But in this tiny percentage the registrant

15  would have a Fifth Amendment right not to give the government

16  that information that would then help the government convict

17  him of a crime.  I mean, that's the principle of the United

18  States v Leary and other cases that government can't pick out

19  people that it thinks are likely to commit crimes and create

20  statutes that force them to incriminate themselves.

21          We are not bringing a Fifth Amendment challenge to

22  this because our clients aren't using the Internet to commit

23  a crime.  They have no intention of doing that.  The vast

24  majority of registrants are not going to use the Internet to

25  commit a crime.  But those people that the government is

1  looking for who are using the Internet who are, there's the

2  Fifth Amendment problem to enforcing the statute as *U.S. v.*

3  *Leary*, which involved a tax on marijuana that Timothy Leary

4  challenged.

5        The other way that you are being asked to rewrite

6  the statute is to include protections against the misuse of

7  this information that don't appear in any statute.

8  Apparently they are in ALR 3rd.  That's not a binding,

9  authoritative construction of any statute that this Court can

10 rely on.

11       Section 290.45 only contains penalties when someone

12 uses this information to commit a discrete crime.  That

13 doesn't cover retaliation -- doesn't cover anything like

14 that.

15       The -- one of the last things I'll say.  Yes, it's

16 true that there is a scienter requirement, which is good.  But I

17 think that the government is wrong to say that that means that

18 people wouldn't be prosecuted.

19       In the *Aragon* case Mr. Aragon was prosecuted.  He

20 was convicted nearly a decade after the Supreme Court --

21 California Supreme Court had held that there is a scienter

22 requirement.  It didn't save him until he had already served

23 time and got his conviction reversed on appeal.

24       That merely confirms that people will be

25 prosecuted.  And the fact that they might get out after a few

1  years because the Court of Appeals agrees that they should

2  not have been convicted is again likely to be cold comfort.

3      I don't see how people can work hand in hand with law

4  enforcement if they are simply allowed to send in a piece of

5  paper when they develop a new Internet identifier.  That seems

6  inconsistent.

7      **THE COURT:**  Say that again.

8      **MR. RISHER:**  The government said, "Well, you are not

9  going to have problems with people knowing what they have to

10  report and what they don't have to report because they are --

11  they will be sitting down with a law enforcement officer

12  determining what needs to be reported."  Putting aside serious

13  vagueness issues that raises, that's not applicable if they get

14  a new identifier and take on a new ISP and simply want to send

15  that in.

16      As to what the government can use this for, again,

17  there's no limit in the statute that says they can't do it for

18  surveillance.  The government now notifies a community:  "Such

19  and such registrant has moved into your community.  Beware."

20  That seems completely analogous to the government notifying a

21  community, "Such and such a registrant has this Internet

22  identifier presumably that he uses on World of War Craft" --

23  although it's still not clear to me whether registrants have to

24  submit the website they use the identifier on, or just the

25  identifier itself.  We've discussed that in our briefs.  I still

1    don't have an answer.

2          But if the government can release the address, the

3    photograph of a registrant under current law before Prop 35,

4    surely it can release the online identification of the

5    registrant in the same way under Prop 35, and there's nothing

6    to stop it from doing so.

7          And the Penal Code does authorize local law

8    enforcement to conduct surveillance of 290 registrants using

9    Section 290.  It's Penal Code Section 13887.1.  It seems to

10   apply mostly to more serious repeat offenders, but it

11   specifically seems to authorize the government to conduct

12   surveillance using 290 information.  There's certainly

13   nothing that says they can't.

14         There are -- there are a number of other areas I could

15   go into.  I don't think it's necessary.

16         Our essential argument is this law is far too

17   broad.  It's sweeps in far too many people, far too many

18   types of Internet communications.  It is impossibly vague,

19   and the saving constructions that the government is proposing

20   make it very vague and do not sufficiently do anything to

21   reduce the overbreadth.

22         The standard for issuing a preliminary injunction

23   in the Ninth Circuit when constitutional rights are involved

24   or at risk is fairly clear.  We have more than shown the

25   reasonable likelihood of success on the merits that we need

1    to show.  The harm will be irreparable.  The public interest

2    favors supporting the constitutional rights of many thousands

3    of registrants that may have committed these crimes many

4    years ago.  Thank you.

5            **MR. HARRISON:**  Your Honor, could I approach the podium

6    and do it there?

7            **THE COURT:**  Yes.

8            **MR. HARRISON:**  The answer to the question is that

9    nothing in Prop 35 requires that a registrant provide

10   information regarding the websites.

11           **THE COURT:**  Can I have the file there?  Okay.  I

12   believe I saw papers for the intervenors from the firm Johansen.

13   I meant to do this at the start.

14           Just by way of disclosure, Johansen, Remcho and

15   Purcell derives from a firm once called as I said in those

16   days "Rose and Remcho and Henderson."  And I simply should

17   disclose that I'm not going do anything untoward.  In fact, I

18   don't see anyone at the table that I know, but I want to put

19   it on the record that I'm aware of that.

20           Okay.  The matter is submitted, Counsel.  I will be

21   coming out with a ruling as quickly as I can.

22           **MR. RISHER:**  Thank you.

23           **MR. HARRISON:**  Thank you.

24           **MR. WILSON:**  Thank you.

25           (The proceedings concluded at 12:40 P.M.)

ER-0106

1
2                    **CERTIFICATE OF REPORTER**

3         I, CHRISTINE TRISKA, Pro-Tem Reporter for the United

4    States Court, Northern District of California, hereby certify

5    that the foregoing proceedings in Case No. 12-5713 TEH, Doe et

6    al. versus Harris et al. were reported by me, a certified

7    shorthand reporter, and were thereafter transcribed under my

8    direction into typewriting; that the foregoing is a full,

9    complete and true record of said proceedings as bound by me at

10   the time of filing.

11        The validity of the reporter's certification of

12   said transcript may be void upon disassembly and/or

13   removal from the court file.

14

15                _____/S/ Christine Triska_____

16               Christine Triska, CSR 12826, RPR

17                 Saturday, December 29, 2012

18

19

20

21

22

23

24

25

Christine A. Triska, CSR 12826
Pro-Tem Reporter -- U.S. District Court
(650) 743-8425

ER-0107

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN DOE, et al.,

                Plaintiffs,

      v.

KAMALA D. HARRIS, et al.,

                Defendants.

NO. C12-5713 TEH

<u>ORDER WITH QUESTIONS FOR
COUNSEL FOR DECEMBER 17
HEARING</u>

**United States District Court**
For the Northern District of California

This Case will come before the Court on December 17, 2012, on Plaintiffs' Motion for a Preliminary Injunction and on the Motion to Intervene filed by the official proponents of Proposition 35. The Court would like the parties to be prepared to answer the following questions at the hearing. If Proponents' motion is granted, they may respond to questions related to the Motion for a Preliminary Injunction, to the extent that their responses are not duplicative of State Defendant's responses. The parties need not submit answers in writing but shall come to the December 17 hearing prepared to address the following:

**Re: Intervention**

<u>For Plaintiffs and Proponents</u>

1.     The Court's understanding is that the Ninth Circuit has not squarely ruled on the question of whether Article III standing is required for intervention when another party with standing on the same side as the intervenor remains in the case, and that other circuits are split. In light of this, wouldn't it be within the Court's broad discretion to grant permissive intervention?

2.      How, if at all, is the Supreme Court's grant of certiorari in *Perry* relevant to the Court's determination whether Proponents should be permitted to intervene?


**Re: Preliminary Injunction**

For Both Sides

1.      If the Court concludes that the CASE Act's definition of "Internet service provider" is vague or overbroad, can the Court construe the definition narrowly in order to save it?  If so, how do you propose the Court construe it?

2.      Would it be permissible for a court to construe the requirement to provide "A list of any and all Internet service providers used by the person," § 290.015(5), as only requiring the reporting of Internet service providers with which the registrant has an open account at the time of registration?

3.      Does § 290.018's scienter element mitigate the effects of any ambiguity with regard to the CASE Act's reporting requirements?  Why or why not?

4.      Is speech by sex offenders entitled to the same level of First Amendment protection as speech by anyone else?  What types of speech could RSOs be undertaking on the Internet that would not be fully protected under the First Amendment?

5.      Can the government legitimately use the Internet-related information provided under the CASE Act to monitor registrants' speech on the Internet in the absence of a specific criminal investigation?  In other words, is surveillance a permissible purpose?

6.      If surveillance in the absence of a specific criminal investigation is not a permissible purpose, what in the California registration system prevents local law enforcement from

United States District Court
For the Northern District of California

2

deciding that the best way to ensure public safety is to monitor RSOs' pseudonymous speech?

7.    If such surveillance is permissible, what makes it permissible, assuming we are talking about people who are not on probation or parole?  Do the cases upholding sex offender registration generally stand for the proposition that sex offenders can be subjected to speech surveillance?

8.    Assume for the purposes of argument that there is no risk of public disclosure of the RSOs' internet identifiers.  Is that the end of the First Amendment (as opposed to the vagueness) claim?

9.    What limitations, if any, are there on the means by which a law enforcement entity may disseminate a RSO's Internet identifiers and ISPs to the public?  How do law enforcement entities determine that public dissemination of information about a RSO is "necessary to ensure the public safety"?

10.    I'd like both sides to weigh in on whether the following online usernames/identifiers would need to be reported:

   a. Online banking username

   b. Amazon.com username

   c. New York Times username, if posting about an article

   d. New York Times username, if user reads content but does not post

   e. Best Buy username

   f. Usernames used for blogging

United States District Court

For the Northern District of California

3

g. An old email address or Myspace username associated with an account that the RSO does not use or check

11.    The Government states that law enforcement officers' access to the registrants' information is governed by a "need to know/right to know" policy.  What governs law enforcement officers' "need to know" and "right to know"?

For Plaintiffs

1.    What is your best argument that this is a class-of-speaker regulation triggering strict scrutiny?

2.    *Buckley* dealt with public disclosure of the names of ballot initiative circulators.  What case supports your position that a requirement to disclose one's name to law enforcement infringes on the right to speak anonymously, setting aside the possibility of wider disclosure/dissemination?

3.    Where in the First Amendment analysis does the 24-hour reporting time issue come into play?

For Defendant

1.    The overarching issue that presents itself with regard to the tailoring of this statute is how the information gained through the CASE Act's reporting requirements would help combat human trafficking and/or sex crimes.  For instance:

a.  State: You assert that this statute will help you "protect[] innocent victims (particularly children) from predatory Internet activities."  State's Opp'n at 10.  How so?

b.  Proponents: You posit that "law enforcement will use sex offenders' Internet identifiers to determine whether the email address of a person who used the Internet to lure a child into human trafficking belongs to a registered sex offender."  Prop's Opp'n at 1.  Please

4

1  explain concretely how law enforcement will be presented with the scenario described and
2  how the Internet identifiers will help. .

3      c.  Proponents: you assert that "the state will be far better able to quickly identify
4  and investigate suspects when presented with evidence that a crime involving the use of the
5  Internet to facilitate trafficking or sexual exploitation of minors has been or is about to be
6  committed." Prop's Opp'n at 17 & n.11.  Please explain how this is so.
7

8      d.  Proponents: you cite the "vital prophylactic purpose" of requiring RSOs to turn
9  over this information because, "After all, a human trafficker who must begin turning over his
10  Internet identifiers immediately may be deterred from online predatory conduct immediately,
11  based on the knowledge that the police will eventually track him down." Prop's Opp'n at 24.
12  Please explain what fact-based evidence you have that this is so.

13      e.  How would knowing a registrant's ISP be of use to law enforcement?
14

15  2.      Is there any connection between these provisions and human trafficking? Is there
16  evidence that RSOs are more likely to be human traffickers than non-RSOs?

17
18  3.      Do you contend that the requirement to report ISPs applies to ISPs that registrants use
19  when they access the Internet from public places such as Internet cafés?

20  4.      What types of online communications by RSOs would it be most helpful to law
21  enforcement to be able to monitor?

22
23  5.      How can speech posted on publicly accessible (without a login) websites and forums
24  such as the New York Times or the Reform website be used to commit sex crimes?

25  6.      Could the CASE Act's goals be achieved if its registration requirements applied to a
26  narrower class of RSOs, such as those who were at high risk of reoffending or those who
27  used the Internet to commit a sex offense in the past?

28

United States District Court
For the Northern District of California

5

1   **IT IS SO ORDERED.**

2

3   Dated:  12/13/12

                THELTON E. HENDERSON, JUDGE

4                 UNITED STATES DISTRICT COURT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California

6

ER–0113